UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY,<br>ALLSTATE INDEMNITY COMPANY,<br>ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, and<br>ALLSTATE FIRE & CASUALTY INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>JASON BIRNHAK, D.C.,<br>JOHANNA CASTELLANO, P.T.,<br>PAUL MANADAN, M.D.,<br>HYE HYUN CHUNG, L.AC.,<br>RICHARD KOFFLER, M.D.,<br>QUANTUM PHYSICAL THERAPY & CHIROPRACTIC CARE, PLLC,<br>NEW MILLENNIUM PAIN AND SPINE MEDICINE, PLLC,<br>CAREPOINT ACUPUNCTURE, P.C.,<br>ONEPOINT ACUPUNCTURE, P.C., and<br>RCK MEDICAL SERVICES, P.C.,<br><br>Defendants. | C.A. No.___ |

**PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company (collectively, "Allstate" and/or "plaintiffs"), by their attorneys, King, Tilden, McEttrick, & Brink, P.C., allege as follows:

## I. INTRODUCTION

1. This case is about a chiropractor, Jason Birnhak, D.C. ("Birnhak"), and a physical therapist, Johanna Castellano, P.T. ("Castellano"), that teamed together as business partners to orchestrate a complex scheme to defraud insurance companies, including Allstate, by (i) operating and controlling an organization of healthcare providers, including physicians and an acupuncturist,

and (ii) providing medically unnecessary and excessive healthcare services from a number of locations in the Eastern District of New York.

2. Birnhak and Castellano, a chiropractor and physical therapist licensed in the State of New York, respectively, schemed to unlawfully profit from the provision of an array of healthcare services, including chiropractic treatment, physical therapy, orthopedic services, pain management services, disability evaluations, and acupuncture treatment, by seeking payment for such healthcare services even though they were excessive and medically unnecessary.

3. Birnhak and Castellano purport to own the professional limited liability company, Quantum Physical Therapy & Chiropractic Care, PLLC ("Quantum PT").

4. However, the New York State Education Department Office of Professions' records identify Birnhak and his former business partner, Michael P. O'Conner ("O'Conner"), as Quantum PT's only shareholders, officers, and/or directors.

5. Further, the New York State Education Department Office of Professions' records indicate that Castellano is not listed as a shareholder, officer, and/or director of any entity.

6. As alleged herein, Birnhak and Castellano intentionally devised a scheme whereby they recruited and induced a variety of professional healthcare providers to operate from various multi-disciplinary healthcare facilities that were managed and controlled by Birnhak and Castellano, from which Birnhak and Castellano operated Quantum PT.

7. The collection of entities managed and/or controlled by Birnhak and Castellano allowed them to accomplish the main objective of this scheme, which was to take advantage of the generous benefits available under New York's No-Fault insurance laws.

8. To attain their unlawful goals without detection, Birnhak and Castellano purposely and knowingly conspired with the licensed healthcare professionals, Paul Manadan, M.D.

("Manadan"), Hye Hyun Chung, L.Ac. ("Chung"), and Richard Koffler, M.D. ("Koffler") (collectively, the "Nominal Owner Defendants").

9. Birnhak and Castellano recruited the Nominal Owner Defendants to participate in the scheme and had the Nominal Owner Defendants utilize the following entities – which were organized and/or billed under the providers' names – as vehicles to submit No-Fault benefit claims to Allstate: Quantum PT, New Millennium Pain and Spine Medicine, PLLC ("New Millennium"), Carepoint Acupuncture, P.C. ("Carepoint Acupuncture"), Onepoint Acupuncture, P.C. ("Onepoint Acupuncture") and RCK Medical Services, P.C. ("RCK Medical") (collectively, the "PC Defendants").

10. By recruiting the Nominal Owner Defendants, Birnhak and Castellano caused the PC Defendants to utilize the Nominal Owner Defendants' licensing credentials to create the false impression that the entities were separately owned and operated by qualified licensees.

11. At all relevant times, the Nominal Owner Defendants had no actual power or control over the entities registered under their names, including the ability to participate in employee hiring and firing, to control corporate expenses, or to bill insurance providers.

12. In reality, Birnhak and Castellano were the true beneficiaries and decision makers of the PC Defendants.

13. As a licensed chiropractor, Birnhak is prohibited under New York law from owning, controlling, or profiting from professional corporations organized under New York law to provide professional physician, physical therapy, or acupuncture healthcare services.

14. As a licensed physical therapist, Castellano is prohibited under New York law from owning, controlling, or profiting from professional corporations organized under New York law to provide professional physician, chiropractic, or acupuncture healthcare services.

15. To conceal their control over, and profits from, the PC Defendants, Birnhak and Castellano utilized lease and sub-lease agreements that purported to rent office space at several locations that housed one or more of the PC Defendants.

16. These layers of lease and sublease agreements were intentionally crafted as a means to conceal Birnhak's and Castellano's control over one or more of the PC Defendants, and their unlawful splitting of the professional fees and profits collected by these entities in violation of New York law, by disguising the payments—which represented the professional fees and profits of New Millennium, Carepoint Acupuncture, Onepoint Acupuncture, and RCK Medical— as "rent" to Birnhak and Castellano for their personal benefit.

17. Specifically, Birnhak and Castellano, through Quantum PT, leased or subleased office space at the multi-disciplinary healthcare facilities located at (i) 1308 Grand Avenue, Baldwin, New York; (ii) 139 North Central Avenue, Suite 4, Valley Stream, New York; (iii) 175-43 Hillside Avenue, Jamaica, New York; (iv) 1955 Merrick Road, Suite 105, Merrick, New York; (v) 794 Harrison Avenue, Riverhead, New York; (vi) 26 Sherman Avenue, New York, New York; (vii) 1383 Veterans Memorial Highway, Hauppauge, New York; (viii) 731 Flushing Avenue, Brooklyn, New York; (ix) 145 East 32nd Street, Suite 1A, Manhattan, New York; and (x) 1010 North Broadway, Suite 1, Yonkers, New York in furtherance of this scheme.

18. As explained herein, throughout the course of this scheme, Birnhak, Castellano, Manadan, Chung, Koffler, Quantum PT, New Millennium, Carepoint Acupuncture, Onepoint Acupuncture, and RCK Medical (collectively, the '"Defendants") (or those working under their direction and control) purposely induced Allstate to pay the PC Defendants for healthcare services purportedly provided to Allstate Claimants while knowing that the charges for these services were not compensable under New York law.

19. These No-Fault benefit claims were not compensable under New York law, as the healthcare services that were purportedly rendered by the PC Defendants to Allstate Claimants were (1) fraudulent, (2) rendered pursuant to an unlawful referral and financial arrangement, (3) excessive and medically unnecessary, (4) rendered as part of a predetermined treatment protocol, and/or (5) provided for the sole purpose of maximizing the Defendants' profits rather than improving the condition of each patient.

20. These No-Fault benefit claims were further not compensable under New York law as the PC Defendants were not legally operated in accordance with New York law.

21. The success of the Defendants' scheme to defraud relied on the transmission to Allstate, through the U.S. Mail and/or interstate wires, of invoices, bills, and other No-Fault claim reimbursement documents warranting the PC Defendants' eligibility to collect No-Fault benefits under New York law.

22. Allstate reasonably relied on the facial validity of the PC Defendants' documents—and representations contained therein—when paying No-Fault claims submitted by (or on behalf of) the PC Defendants.

23. By this Complaint, Allstate asserts claims against the defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq*.; (b) common-law fraud; and (c) unjust enrichment.

24. Through this action, Allstate seeks to recover all monies wrongfully paid to Quantum PT, New Millennium, Carepoint Acupuncture, Onepoint Acupuncture, and RCK Medical.

25. Specifically Allstate seeks to recover actual damages totaling over $3,778,833.92, which represent No-Fault benefit payments that Allstate was wrongfully caused to make to the defendants during the course of this scheme.

26. Allstate also seeks a declaration that it has no legal obligation to make any payments on any No-Fault claims that have been submitted by (or on behalf of) Quantum PT, New Millennium, Carepoint Acupuncture, Onepoint Acupuncture, and RCK Medical because the treatments and services purportedly provided to Allstate-covered patients were rendered in direct violation of one or more New York State licensing requirement necessary to provide such treatments and services, thus rendering Quantum PT, New Millennium, Carepoint Acupuncture, Onepoint Acupuncture, and RCK Medical completely ineligible to seek No-Fault reimbursement under prevailing New York laws and regulations.

27. All of the acts and omissions of the defendants described throughout this Complaint were undertaken purposely, knowingly, and intentionally.

28. Each Defendant named herein conspired with at least one other Defendant to accomplish and to further the objectives of their scheme to defraud.

29. The Defendants purposely designed and executed this scheme with the express aim of eliciting payments of automobile insurance contracts proceeds from Allstate to Quantum PT, New Millennium, Carepoint Acupuncture, Onepoint Acupuncture, and RCK Medical for the benefit of each and all of the Defendants named herein.

30. In each claim detailed throughout this Complaint and in the accompanying Exhibits, an Allstate automobile insurance contract was the platform upon which the defendants perpetuated their scheme to defraud.

31. The Defendants knew that the patients identified in this Complaint were eligible for insurance coverage under automobile insurance policies issued by Allstate.

32. Allstate estimates that the Defendants, in furtherance of this scheme, purposely and knowingly submitted to Allstate hundreds of bills on behalf of the PC Defendants knowing that none of the bills were lawfully compensable under prevailing New York law relative to No-Fault insurance coverage and reimbursement eligibility.

## II. THE PARTIES

### A. PLAINTIFFS

33. Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company, are corporations duly organized and existing under the laws of the State of Illinois, having their principal place of business in Northbrook, Illinois.

34. At all relevant times to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company, were each authorized to conduct business in New York.

### B. DEFENDANTS

#### 1. "MANAGEMENT DEFENDANTS"

##### a. Jason Birnhak, D.C.

35. Birnhak resides in and is a citizen of the State of New York.

36. At all relevant times, Birnhak has been licensed to provide chiropractic treatment in the State of New York.

37. However, at no time has Birnhak been licensed or otherwise authorized to practice medicine, physical therapy, or acupuncture in the State of New York or elsewhere.

38. According to records on file with the New York Department of State, Birnhak is an officer, director, and/or shareholder of Quantum PT.

39. When patients sought healthcare services from Quantum PT, they were caused to enter into assignment of benefits agreements with Quantum PT, thus giving Quantum PT the right to seek No-Fault payments directly from insurers.

40. As an assignee of its patients' benefits, Quantum PT sought and collected No-Fault payments directly from insurers, including Allstate.

41. During the relevant period, Birnhak exerted control over the day-to-day operation and management of the PC Defendants by, among other things, controlling the companies' finances, and by intentionally submitting, or causing the submission of, claims to Allstate that contained false information.

42. As detailed herein, Birnhak participated in the operation and management of the PC Defendants during the entirety of this scheme, and also conducted the affairs of these enterprises through a pattern of mail fraud and/or wire fraud racketeering activity.

43. Birnhak furthered the objectives of this scheme by (a) seizing control over the PC Defendants despite not being authorized to provide or manage the provision of medical, physical therapy, and acupuncture treatment and services, (b) exerting control over the operation and management of the PC Defendants, (c) devising and implementing a routine protocol of medically unnecessary and excessive healthcare services and referrals to be followed at the multi-disciplinary healthcare facilities at which Quantum PT and one or more of the PC Defendants treated patients, (d) submitting, or causing the submission of No-Fault benefit claims to Allstate that contained

false information about the PC Defendants' eligibility to seek and collect No-Fault benefit payments, (e) causing the PC Defendants to collect payments that they were not lawfully entitled to collect, (f) unlawfully channeling the professional fees and profits of the PC Defendants for his own personal benefit, (g) providing unnecessary chiropractic treatment through Quantum PT, and (h) demanding and collecting payment for the unnecessary chiropractic treatment.

44. Because he directly participated in the operation and management of the PC Defendants enterprises throughout the course of this scheme, Birnhak is responsible for the fraudulent and non-compensable healthcare services rendered to patients of these entities, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to these entities.

**b. Johanna Castellano, P.T.**

45. Castellano resides in and is a citizen of the State of New York.

46. At all relevant times, Castellano has been licensed to provide physical therapy in the State of New York.

47. However, at no time has Castellano been licensed or otherwise authorized to practice medicine, chiropractic treatment, or acupuncture in the State of New York or elsewhere.

48. According to records on file with the New York Department of State, Castellano is not listed as an officer, director, and/or shareholder of Quantum PT nor any professional corporation.

49. At all relevant times, Castellano has identified herself as a "Co-Owner" of Quantum PT.

50. Moreover, Quantum PT's website asserts that "Castellano became one of the founders of Quantum Physical Therapy & Chiropractic Care, PLLC, in 2012."

51. When patients sought healthcare services from Quantum PT, they were caused to enter into assignment of benefits agreements with Quantum PT, thus giving Quantum PT the right to seek No-Fault payments directly from insurers.

52. As an assignee of its patients' benefits, Quantum PT sought and collected No-Fault payments directly from insurers, including Allstate.

53. During the relevant period, Castellano exerted control over the day-to-day operation and management of the PC Defendants by, among other things, controlling the companies' finances, and by intentionally submitting, or causing the submission of, claims to Allstate that contained false information.

54. As detailed herein, Castellano participated in the operation and management of the PC Defendants during the entirety of this scheme, and also conducted the affairs of these enterprises through a pattern of mail fraud and/or wire fraud racketeering activity.

55. Castellano furthered the objectives of this scheme by (a) seizing control over the PC Defendants despite not being authorized to provide or manage the provision of medical, chiropractic, and acupuncture treatment and services, (b) exerting control over the operation and management of the PC Defendants, (c) devising and implementing a routine protocol of medically unnecessary and excessive healthcare services and referrals to be followed at the multi-disciplinary healthcare facilities at which Quantum PT and one or more of the PC Defendants treated patients, (d) submitting, or causing the submission of No-Fault benefit claims to Allstate that contained false information about the PC Defendants' eligibility to seek and collect No-Fault benefit payments, (e) causing the PC Defendants to collect payments that they were not lawfully entitled to collect, (f) unlawfully channeling the professional fees and profits of the PC Defendants for her

own personal benefit, (g) providing unnecessary physical therapy treatment through Quantum PT, and (h) demanding and collecting payment for the unnecessary physical therapy treatment.

56. Because she directly participated in the operation and management of the PC Defendants enterprises throughout the course of this scheme, Castellano is responsible for the fraudulent and non-compensable healthcare services rendered to patients of these entities, and is thus also jointly and severally liable for the payments that Allstate was wrongfully induced to make to these entities.

### 2. "NOMINAL OWNER DEFENDANTS"

#### a. Paul Manadan, M.D.

57. Manadan resides in and is a citizen of the State of New York.

58. At all relevant times, Manadan has been licensed to provide medical services in the State of New York.

59. According to records on file with the New York Department of State, Manadan is the sole officer, director, and/or shareholder of New Millennium.

60. At all relevant times, Birnhak and Castellano—and not Manadan—unlawfully managed, controlled, and operated New Millennium.

61. At all relevant times, Birnhak and Castellano directed Manadan and/or his agents at New Millennium to perform excessive and medically unnecessary healthcare services for patients of New Millennium.

62. When patients sought healthcare services from New Millennium, they were caused to enter into assignment of benefits agreements with New Millennium, thus giving New Millennium the right to seek No-Fault payments directly from insurers.

63. As an assignee of its patients' benefits, New Millennium sought and collected No-Fault payments directly from insurers, including Allstate.

64. As detailed herein, Birnhak, Castellano, and Manadan purposely sought No-Fault benefit payments from Allstate knowing that New Millennium was not lawfully eligible to seek or collect such payments.

65. Because he directly participated in the operation and management of the New Millennium enterprise throughout the course of this scheme, Manadan is responsible for the fraudulent services provided to patients of this entity, and is thereby also jointly and severally liable for the payments that Allstate was wrongfully induced to make to this entity.

**b. Hye Hyun Chung, L.Ac.**

66. Chung resides in and is a citizen of the State of New York.

67. At all relevant times, Chung has been licensed to provide acupuncture in the State of New York.

68. According to records on file with the New York Department of State, Chung is the sole officer, director, and/or shareholder of Carepoint Acupuncture and Onepoint Acupuncture.

69. At all relevant times, Birnhak and Castellano—and not Chung—unlawfully managed, controlled, and operated Carepoint Acupuncture and Onepoint Acupuncture.

70. At all relevant times, Birnhak and Castellano directed Chung and/or her agents at Carepoint Acupuncture and Onepoint Acupuncture to perform excessive and medically unnecessary acupuncture treatment for patients of Carepoint Acupuncture and Onepoint Acupuncture.

71. When patients sought healthcare services from Carepoint Acupuncture and Onepoint Acupuncture, they were caused to enter into assignment of benefits agreements with

Carepoint Acupuncture and Onepoint Acupuncture, thus giving Carepoint Acupuncture and Onepoint Acupuncture the right to seek No-Fault payments directly from insurers.

72. As an assignee of its patients' benefits, Carepoint Acupuncture and Onepoint Acupuncture sought and collected No-Fault payments directly from insurers, including Allstate.

73. As detailed herein, Birnhak, Castellano, and Chung purposely sought No-Fault benefit payments from Allstate knowing that Carepoint Acupuncture and Onepoint Acupuncture were not lawfully eligible to seek or collect such payments.

74. Because she directly participated in the operation and management of the Carepoint Acupuncture and Onepoint Acupuncture enterprises throughout the course of this scheme, Chung is responsible for the fraudulent services provided to patients of these entities, and is thereby also jointly and severally liable for the payments that Allstate was wrongfully induced to make to these entities.

**c. <u>Richard Koffler, M.D.</u>**

75. Koffler resides in and is a citizen of the State of Florida.

76. At all relevant times, Koffler has been licensed to provide medical services in the State of New York.

77. According to records on file with the New York Department of State, Koffler is the sole officer, director, and/or shareholder of RCK Medical.

78. In 2022, Koffler was alleged to have ceded the control of his medical practice to unlicensed laypersons. *See Allstate Insurance Company et al v. Rauch, D.C. et al.*, United States District Court for the Eastern District of New York, Civil Docket No.: 2:2022-cv-02424.

79. Here, it is alleged that Koffler ceded control of RCK Medical to Birnhak and Castellano at the multi-disciplinary healthcare facilities operated by Quantum PT.

80. As such, at all relevant times, Birnhak and Castellano—and not Koffler—unlawfully managed, controlled, and operated RCK Medical.

81. At all relevant times, Birnhak and Castellano directed Koffler and/or his agents at RCK Medical to perform excessive and medically unnecessary healthcare services for patients of RCK Medical.

82. When patients sought healthcare services from RCK Medical, they were caused to enter into assignment of benefits agreements with RCK Medical, thus giving RCK Medical the right to seek No-Fault payments directly from insurers.

83. As an assignee of its patients' benefits, RCK Medical sought and collected No-Fault payments directly from insurers, including Allstate.

84. As detailed herein, Birnhak, Castellano, and Koffler purposely sought No-Fault benefit payments from Allstate knowing that RCK Medical was not lawfully eligible to seek or collect such payments.

85. Because he directly participated in the operation and management of the RCK Medical enterprise throughout the course of this scheme, Koffler is responsible for the fraudulent services provided to patients of this entity, and is thereby also jointly and severally liable for the payments that Allstate was wrongfully induced to make to this entity.

### 3. "PC DEFENDANTS"

#### a. Quantum Physical Therapy & Chiropractic Care, PLLC

86. Quantum PT is organized under New York law as a professional limited liability company with its principal executive office located at 1308 Grand Avenue, Baldwin, New York.

87. As organized, Quantum PT was authorized to provide physical therapy and chiropractic treatment.

88. At all times relevant, Birnhak and his former business partner, Michael P. O'Conner, P.T., have been listed as the officers, directors, and/or shareholders of Quantum PT.

89. At all times relevant, Castellano has purported to be the "Co-Owner" of Quantum PT.

90. As alleged herein, Quantum PT furnished, or was caused to furnish, physical therapy and chiropractic treatment to patients which were: (a) rendered pursuant to an unlawful referral and financial agreement; (b) rendered as part of a predetermined treatment protocol; (c) excessive and medically unnecessary; and (d) provided for the sole purpose of maximizing the profits of the Defendants rather than improving the condition of each patient.

91. Accordingly, as alleged herein, Quantum PT (and/or persons working on behalf of Quantum PT, including but not limited to Birnhak and Castellano) purposely caused Quantum PT to seek No-Fault benefit payments from Allstate knowing that Quantum PT was not lawfully eligible to seek or collect such payments.

### b. New Millennium Pain and Spine Medicine, PLLC

92. New Millennium is organized under New York law as a professional limited liability company with its principal executive office located at 1955 Merrick Road, Suite 105, Merrick, New York.

93. As organized, New Millennium was authorized to provide professional physician services.

94. At all times relevant, Manadan has purported to be the sole officer, director, and/or shareholder of New Millennium.

95. As set out below, Birnhak and Castellano participated in the operation and management of the New Millennium enterprise by exerting unlawful control over Manadan and New Millennium, including New Millennium's professional fees and profits.

96. As part of this scheme, New Millennium was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though New Millennium was unlawfully operated and controlled by one or more non-physician (i.e., Birnhak and/or Castellano).

97. Because New Millennium was unlawfully operated and controlled by one or more non-physician (i.e., Birnhak and/or Castellano), New Millennium was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

**c. <u>Carepoint Acupuncture, P.C.</u>**

98. Carepoint Acupuncture is organized under New York law as a professional service corporation with its principal executive office located at 175-43 Hillside Avenue, Jamaica, New York.

99. As organized, Carepoint Acupuncture was authorized to provide acupuncture treatment.

100. At all times relevant, Chung has purported to be the sole officer, director, and/or shareholder of Carepoint Acupuncture.

101. As set out below, Birnhak and Castellano participated in the operation and management of the Carepoint Acupuncture enterprise by exerting unlawful control over Chung and Carepoint Acupuncture, including Carepoint Acupuncture's professional fees and profits.

102. As part of this scheme, Carepoint Acupuncture was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Carepoint Acupuncture was unlawfully operated and controlled by one or more non-physician (i.e., Birnhak and/or Castellano).

103. Because Carepoint Acupuncture was unlawfully operated and controlled by one or more non-physician (i.e., Birnhak and/or Castellano), Carepoint Acupuncture was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

**d. Onepoint Acupuncture, P.C.**

104. Onepoint Acupuncture is organized under New York law as a professional service corporation with its principal executive office located at 139 North Central Avenue, Suite 4, Roslyn Heights, New York.

105. As organized, Onepoint Acupuncture was authorized to provide acupuncture treatment.

106. At all times relevant, Chung has purported to be the sole officer, director, and/or shareholder of Onepoint Acupuncture.

107. As set out below, Birnhak and Castellano participated in the operation and management of the Onepoint Acupuncture enterprise by exerting unlawful control over Chung and Onepoint Acupuncture, including Onepoint Acupuncture's professional fees and profits.

108. As part of this scheme, Onepoint Acupuncture was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though Onepoint Acupuncture was unlawfully operated and controlled by one or more non-physician (i.e., Birnhak and/or Castellano).

109. Because Onepoint Acupuncture was unlawfully operated and controlled by one or more non-physician (i.e., Birnhak and/or Castellano), Onepoint Acupuncture was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

**e. <u>RCK Medical Services, P.C.</u>**

110. RCK Medical is organized under New York law as a professional service corporation with its principal executive office located at 44 Bethpage Road, Suite 3, Hicksville, New York

111. As organized, RCK Medical was authorized to provide professional physician services.

112. At all times relevant, Koffler has purported to be the sole officer, director, and/or shareholder of RCK Medical.

113. As set out below, Birnhak and Castellano participated in the operation and management of the RCK Medical enterprise by exerting unlawful control over Koffler and RCK Medical, including RCK Medical's professional fees and profits.

114. As part of this scheme, RCK Medical was caused to aggressively seek and collect payments from Allstate under New York's No-Fault laws even though RCK Medical was unlawfully operated and controlled by one or more non-physician (i.e., Birnhak and/or Castellano).

115. Because RCK Medical was unlawfully operated and controlled by one or more non-physician (i.e., Birnhak and/or Castellano), RCK Medical was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

## III. JURISDICTION AND VENUE

116. Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

117. Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

118. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

119. The PC Defendants conducted business in the State of New York by submitting bills under New York's No-Fault laws for healthcare services that were purportedly provided to patients who lived in New York or who were covered by New York automobile insurance policies issued by Allstate.

120. The Defendants have therefore engaged in purposeful activities in New York by conducting business in New York.

121. The Defendants have also engaged in purposeful activities in New York by causing the PC Defendants to initiate arbitration proceedings in New York against Allstate.

122. The Defendants used New York arbitrations and state court litigation to monetize their fraud against Allstate in such a way to essentially finance their fraudulent practices with proceeds paid by Allstate.

123. The Defendants pattern of submitting and adjudicating baseless and repetitive claims have themselves helped to perpetuate their RICO violations.

124. Specifically, the Defendants routinely commence frivolous New York arbitrations and/or state court litigation after Allstate denies their claims to fraudulently obtain No-Fault benefits that are used to finance the RICO scheme.

125. The Defendants' activities in and contact with New York were purposely sought and transacted to take advantage of the benefits available under the No-Fault laws.

126. The allegations and causes of action asserted herein arise from the Defendants' conduct within the State of New York and their purposeful availment of New York's No-Fault insurance system, and therefore there is no question that there exists a substantial relationship between the transactions at issue, and Allstate's causes of action.

127. Overall, the fraudulent scheme alleged herein has many ties to the State of New York, and the ends of justice are best served through this Court's exercise of jurisdiction over the Defendants.

## IV. APPLICABLE LAWS AND REGULATIONS

### A. NEW YORK NO-FAULT LAWS

128. Allstate underwrites motor vehicle insurance in the State of New York.

129. New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services.

130. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act, (N.Y. INS. LAW § 5101, *et seq.*), and the regulations promulgated thereto (11 N.Y.C.R.R. § 65, *et seq.*) (collectively the "No-Fault Laws"), motor vehicle insurers, like Allstate, are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to claimants.

131. Under the New York No-Fault Laws, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

132. "Basic economic loss" is defined to include "all necessary expenses" for healthcare services. *See* N.Y. INS. LAW § 5102(a)(1); 11 N.Y.C.R.R. § 65-1-1.

133. These necessary expenses include physical therapy that is rendered pursuant to a referral from a physician. *See* N.Y. INS. LAW § 5102(a)(1).

134. These No-Fault benefits include up to $50,000 per claimant for reasonable expenses that are incurred for necessary healthcare goods and services.

135. A claimant may assign his or her No-Fault Benefits to third parties, such as healthcare service providers.

136. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary healthcare services rendered using the claim form required by the New York State Department of Insurance (known by its title "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly known as an "NF-3").

137. Alternatively, healthcare providers may submit claims to insurance carriers using the Health Insurance Claim Form (known as the "CMS-1500" form and formerly known as the "HCFA-1500" form).

138. The NF-3 and CMS-1500 forms are important documents in the insurance industry. These documents certify that the provider's request for payment is not materially false, misleading, or fraudulent. *See* 11 N.Y.C.R.R. § 65.3-11(a); N.Y. INS. LAW § 403(d).

139. Pursuant to N.Y. Ins. Law § 403(d), each NF-3 and CMS-1500 form carry the same warning by substance: "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent act, which is a crime."

140. It is a material misrepresentation to submit NF-3 and CMS-1500 forms for treatment, testing, and other services that: (a) are never provided; (b) are billed as expensive/complex procedures when, in reality, a less complex and less expensive service was actually provided; or (c) are billed at a greater monetary charge than is permitted by the applicable fee schedule.

**B. <u>NEW YORK EDUCATION LAW</u>**

141. New York Education Law § 6522 prohibits anyone from engaging in the practice of medicine except for those licensed to practice medicine. *See* N.Y. EDUC. LAW § 6522.

142. Pursuant to New York Education Law § 6530(11), licensed physicians are prohibited from "permitting, aiding or abetting an unlicensed person to perform activities requiring a [medical] license."

143. Under New York Education Law § 6530, it is professional misconduct for a licensed physician to (a) practice the profession fraudulently, (b) order excessive tests or treatments not warranted by the condition of the patient, and (c) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient.

144. Under New York Education Law § 6530(19), it is also professional misconduct for a licensed physician to permit any person to share in the fees for professional services, other than a partner, employee, associate of a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

145. The sharing or splitting of fees derived from the provision of professional physician services constitutes professional misconduct and subjects a physician to serious penalties, including sanctions against the offending physician's medical license.

## C. New York Business Corporation Law

146. In New York, professional service corporations are governed by §§ 1501-1516 of the Business Corporation Law.

147. Under Business Corporation Law § 1504, professional service corporations cannot render professional services except through individuals authorized by law to render such professional services.

148. Moreover, under Business Corporation Law § 1507, a professional service corporation cannot issue shares to individuals unless they are "engaged in the practice of such profession in such [a] corporation." It also prohibits such shareholder(s) from entering into any agreement, granting proxies, or transferring control to individuals who are not authorized by law to practice the profession for which the professional service corporation is authorized to practice.

149. Pursuant to Business Corporation Law § 1508, each director or officer of a professional service corporation must be authorized by law to practice in New York the profession that such corporation is authorized to practice.

150. Taken together, the restrictions set forth under the No-Fault Laws, the Education Law, and the Business Corporation Law are designed to ensure that professional service entities are operated and controlled by individuals that are authorized to practice in the professional discipline(s) offered by the entity.

151. New York's No-Fault Laws expressly provide that "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet ***any*** applicable New York State or local licensing requirement necessary to perform such service in New York." *See* 11 N.Y.C.R.R. § 65-3.16(a)(12) (emphasis added).

152. In *State Farm Mut. Auto. Ins. Co. v. Mallela*, the New York Court of Appeals upheld 11 N.Y.C.R.R. § 65-3.16(a)(12) by holding that corporations organized and registered to provide professional healthcare services that are fraudulently incorporated under New York Business Corporation Law §§ 1507 and 1508 and New York Education Law § 6507(4)(c) (i.e., those corporations that are operated and/or controlled by individuals or entities not licensed or authorized to provide the professional healthcare services that the corporations are organized and registered to provide) are not entitled to No-Fault reimbursement. *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 320 (N.Y. 2005).

153. As such, a professional service corporation is lawfully ineligible to seek or receive No-Fault benefit payments if the entity, or any of its members, fails to meet ***any*** applicable licensing requirement necessary to perform a service. *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

154. Under prevailing law, an insurer may maintain a cause of action to recover monies paid on or after April 5, 2002 (the effective date of 11 N.Y.C.R.R. § 65-3.16(a)(12)) to healthcare providers that are organized, operated, and/or controlled in violation of New York law. *Metroscan Imaging, P.C. v. GEICO Ins. Co.*, 823 N.Y.S.2d 818, 821-22 (N.Y. App. Term, 2d Dep't 2006).

### D. APPLICABLE NEW YORK LAW PROHIBITING CERTAIN REFERRAL ARRANGEMENTS

155. A practitioner who is authorized to order "clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services" is prohibited from making a referral for such services to a healthcare provider who is authorized to provide such services where the practitioner or immediate family member of said practitioner has a financial relationship with the healthcare provider. *See* N.Y. PUB. HEALTH LAW § 238-a(1)(a).

156. A financial relationship is defined as an ownership interest, investment interest or compensation arrangement. *See* N.Y. PUB. HEALTH LAW § 238(3).

157. A compensation arrangement includes "any arrangement involving any remuneration between a practitioner, or immediate family member, and a healthcare provider. The term remuneration includes any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." *See* N.Y. PUB. HEALTH LAW § 238-a(5)(a).

158. Pursuant to Section 238-a(1)(b) of the New York Public Health Law, neither a healthcare provider nor a referring practitioner may present a claim, bill or any other demand for payment for clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services when furnished pursuant to a prohibited referral arrangement.

159. Any such claims, bills or other demands made in connection with an illegal referral arrangement that results in payment to the referring practitioner or healthcare provider shall result in the referring practitioner and healthcare provider being jointly and severally liable for any amount collected. *See* N.Y. PUB. HEALTH LAW § 238-a(7).

160. With respect to referrals not prohibited under Section 238-a, a practitioner may not make a referral to a healthcare provider for the furnishing of any health or health related items or services where such practitioner or immediate family member of such practitioner has a financial relationship with the healthcare provider (i.e., ownership or investment interest or a compensation arrangement that is in excess of fair market value or that provides for compensation that varies directly or indirectly based on the volume or value of any referrals of business between the parties) without disclosing the financial relationship to the patient, which disclosure must provide notice of the financial relationship as well as inform the patient of his or her right to utilize a specifically identified alternative healthcare provider if any such alternative is reasonably available. *See* N.Y. PUB. HEALTH LAW § 238-d(1)-(2).

161. Additionally, New York Education Law § 6530(18) prohibits a licensed physician from "[d]irectly or indirectly offering, giving, soliciting, or receiving, or agreeing to receive, any fee or other consideration to or from a, third party for the referral of a patient or in connection with the performance of professional services."

162. Likewise, under Rule 29.1(b)(3) of the Board of Regents, applicable to "the practice of any profession licensed, certified or registered pursuant to title VIII of the Education Law"—which includes physical therapy, chiropractic, and acupuncture—practitioners are prohibited from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services." 11 N.Y.C.R.R. § 29.1(b)(3).

163. Accordingly, New York law prohibits any licensed physician, physical therapist, chiropractor, or acupuncturist from giving and/or receiving payment to and/or from another licensee or third party in exchange for the referral of a patient.

164. The New York Public Health Law provides that if a healthcare provider violates the statute, the referring provider and the healthcare provider shall be jointly and severally liable to the payor. *See* N.Y. Pub. Health L. § 238-a(7).

## V. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A. GENERAL OVERVIEW OF THE DEFENDANTS' SCHEME TO DEFRAUD ALLSTATE

165. The Defendants knowingly and intentionally engaged in conduct to defraud insurers through the submission of false and fraudulent No-Fault benefit claims.

166. Allstate was and is one of the No-Fault insurance providers victimized by this scheme.

167. New York's No-Fault system is designed to provide patients and healthcare providers with compensation for the provision of healthcare services and is also designed to facilitate prompt payment of patient claims.

168. As a result, the submission of facially valid bills by healthcare service providers for patient services will often result in prompt payment from a No-Fault insurer.

169. As it applies to professional healthcare services provided in the State of New York, healthcare providers are not eligible to seek or receive No-Fault reimbursement under Insurance Law § 5102 if they fail to meet ***any*** New York state or local licensing requirement necessary to perform such services in New York.

170. Birnhak and Castellano were well aware of these conditions of reimbursement when they decided to take advantage of New York's No-Fault system and defraud Allstate by creating and controlling multiple entities that provided physical therapy, chiropractic, pain management, disability impairment testing, and acupuncture services to patients.

171. At all times relevant to this action, Birnhak and Castellano conspired to recruit the Nominal Owner Defendants, cause the fraudulent operation of New Millennium, Carepoint Acupuncture, Onepoint Acupuncture, and RCK Medical, and then control the operation and management of the professional medical corporations.

172. By controlling both the Nominal Owner Defendants and the PC Defendants, Birnhak and Castellano were able to dictate and coordinate the treatment, tests, and services rendered through the PC Defendants as a means to maximize the excessive and medically unnecessary treatments provided to Allstate claimants—and billed to Allstate—through each of the multi-disciplinary healthcare facilities operated and controlled by Birnhak and Castellano.

173. Throughout the course of this scheme, the Defendants have taken advantage of Allstate by demanding and collecting No-Fault benefit payments in connection with (a) healthcare services that were not medically necessary, (b) healthcare services that were excessive, (c) healthcare services that were rendered pursuant to a pre-determined protocol designed to enrich the provider, and (d) healthcare services that were not provided in the manner represented in the bills submitted to Allstate.

174. Such conduct is not only prohibited under New York law, but it was also dangerous to the patients who were subjected to these clinically unwarranted and unneeded healthcare services.

175. As alleged herein, because the Defendants caused Quantum PT, New Millennium, Carepoint Acupuncture, Onepoint Acupuncture, and RCK Medical to operate in violation of New York law throughout the relevant period, Quantum PT, New Millennium, Carepoint Acupuncture, Onepoint Acupuncture, and RCK Medical are not—and never were—eligible to seek or collect No-Fault benefits from Allstate under New York's No-Fault laws.

176. The Defendants knowingly and purposely extracted No-Fault benefit payments from Allstate by (a) misrepresenting the conditions and diagnoses of their patients, (b) providing unnecessary healthcare services based on these misrepresented conditions and diagnoses, and (c) misrepresented the nature and extent of certain healthcare services.

177. The Defendants knew (or should have known) that this conduct was improper, yet they persisted in submitting No-Fault benefit claims to Allstate seeking payment in connection with claimants who were treated by the Defendants (or those persons working under their direction or control) in the manner described herein.

### B. <u>FRAUDULENT OPERATION AND CONTROL OF THE PC DEFENDANTS</u>

178. The Defendants' fraud scheme discussed herein is not an original plan that was designed by Birnhak.

179. Rather, this scheme is an adaptation of an arrangement that Birnhak was purportedly involved in from 2005 through 2011.

180. Specifically, in 2011, Birnhak and eleven (11) additional chiropractors were named as defendants in a lawsuit, wherein they were alleged to have unlawfully referred patients to Stephen A. Matrangolo, D.C. ("Matrangolo") and Marc Felderstein, D.C. ("Felderstein").

181. Matrangolo and Felderstein, through their professional service corporations (i.e., Stephen A. Matrangolo, D.C., P.C. and Marc Felderstein, D.C., P.C.), purportedly utilized these referrals to submit thousands of fraudulent bills relating to medically unnecessary current perception threshold tests, physical performance testing, and neuromuscular diagnostic procedures.

182. As alleged in that complaint, Matrangolo and Felderstein operated transient PCs that did not operate from a specific office location, but rather from the offices of the referring chiropractors.

183. In furtherance of this scheme, Matrangolo and Felderstein were alleged to have entered into agreements with the referring chiropractors to access the referring chiropractors' patients.

184. In exchange for (i) the payment of fees disguised as "rent" to the referring chiropractors, and (ii) the delivery of reports to the referring chiropractors to support their continued treatment of patients and ability to bill insurers, Matrangolo and Felderstein were provided with access to patients and office space to perform the medically unnecessary tests.

185. As such, a symbiotic relationship was developed between Matrangolo and Felderstein, wherein (i) Matrangolo and Felderstein derived significant financial benefits through the systematic referral of patients that they would not have otherwise had access to, while (ii) the referring chiropractors benefitted from lease payments in exchange for access to their patients and fraudulent findings that allowed the referring chiropractors to continue to provide healthcare services to these patients.

186. Notably, Birnhak failed to appear and defend that lawsuit, resulting in the entry of default on October 19, 2011.

187. Subsequent negotiations between the Parties ultimately resulted in the settlement of the suit and the filing of a Stipulation of Dismissal on June 8, 2012.

188. This timing is of importance, as Birnhak consequently incorporated Quantum PT in 2013.

189. After familial issues reportedly caused his business partner to leave the professional service corporation, Birnhak recruited Castellano to participate in the operation and management of Quantum PT.

190. On or about June 7, 2015, Birnhak, O'Conner, and Castellano entered into an Agreement wherein O'Conner's ten (10%) percent interest in Quantum PT was transferred to Castellano.

191. Pursuant to his June 7, 2015, resignation letter, O'Conner requested that Quantum PT's corporate records be corrected to properly reflect the change in ownership.

192. Conspicuously, although Castellano purportedly purchased O'Conner's interest in Quantum PT, neither Castellano nor Birnhak has filed any documents with the New York State

Education Department Office of Professions to disclose her position as a shareholder, officer, and/or director or O'Conner's resignation.

193. Moreover, despite purportedly purchasing an ownership interest in Quantum PT on or about June 7, 2015 – more than a year and a half after Quantum PT was organized – Castellano has been identified as "one of the founders of Quantum" PT on the professional service corporation's website.

194. A true and accurate excerpt from Quantum PT's website is depicted below.

After more than a decade of working and helping others, Castellano became one of the founders of Quantum Physical Therapy & Chiropractic Care, PLLC, in 2012 to continue with her passion and help as many patients receive expert, personalized care as possible.

195. A true and accurate image from the New York State Education Department Office of Professions' record regarding Castellano is depicted below.

**Johanna Castellano PT**
**License No.: 038739**

**Johanna Castellano PT** is listed as a shareholder, officer and/or director of the following entities:

| PSC # | Corporate Name | Joined | Left |
|---|---|---|---|
| N/A | N/A | N/A | N/A |
| | | | |
| | | | |
| | | | |
| | | | |

196. A true and accurate image from the New York State Education Department Office of Professions' record regarding Quantum PT is depicted below.

QUANTUM PHYSICAL THERAPY & CHIROPRACTIC CARE PLLC
Professional Corporations # 103624

| LIC # | Licensee Name | Joined | Left |
|---|---|---|---|
| 008482 | JASON TODD BIRNHAK | 11/07/13 | - |
| 015072 | MICHAEL P O'CONNER | 11/07/13 | - |
| | | | |
| | | | |
| | | | |
| | | | |

197. From the onset, Quantum PT has identified itself as an "outpatient Multi-disciplinary Rehabilitation Facility that caters to patients with Musculoskeletal injuries due to automobile accidents, slip and falls, workers compensation trauma and all other injuries", which offered physical therapy, chiropractic, massage therapy, and acupuncture treatment at its initial two (2) locations.

198. Subsequent iterations of Quantum PT's website document their "affiliations" with orthopedic surgeons, interventional pain management specialists, physiatrists, and neurologists.

199. In furtherance of this scheme and to avoid "affiliations" with various physicians, Birnhak and Castellano recruited Manadan, Chung, and Koffler to expand their operation and create a series of one-stop multidisciplinary facilities, wherein patients could receive a predetermined course of pain management, orthopedic, neurologic, and rehabilitation services as well as electro-diagnostic testing in addition to chiropractic care, physical therapy, and acupuncture treatment.

200. To effectuate this scheme, Birnhak entered into a series of lease agreements, wherein Manadan, Chung, and Koffler were provided with access to office space at Quantum PT's ten (10) locations.

201. In many instances, the lease agreements contained provisions for the supply of personnel, wherein employees of Quantum PT were tasked with providing services to the lessees.

202. Specifically, employees of Quantum PT were responsible for answering phones, scheduling appointments, greeting patients, collecting payments (e.g., co-payments and deductibles) from patients, and providing other services that were reasonably requested by the lessees.

203. Facially, these provisions appear to provide additional incentives to the lessees in addition to their access to Quantum PT's office space.

204. In reality, however, these services allowed Birnhak and Castellano to direct the course of predetermined treatment, as employees of Quantum PT were responsible for the scheduling of the patients' appointments and the management of the patients' non-medical care.

205. Remarkably, many of these agreements provided limits on the number of days that the providers could be present at these locations, as well as the requirement regarding the provider's use of the leased space.

206. For example, the lease agreements between Quantum PT and New Millennium restricted Manadan's access to the facilities located at (i) 1308 Grand Avenue, Baldwin, New York; (ii) 139 North Central Avenue, Suite 4, Valley Stream, New York; and (iii) 175-43 Hillside Avenue, Jamaica, New York to two (2) days per week between the hours of 10:00 a.m. and 7:00 p.m.

207. Notably, however, these lease agreements required that Manadan use the leased space for "at least two (2) Scheduled Sessions per week".

208. A true and accurate excerpt from the form lease agreements between Manadan, on behalf of New Millennium, and Birnhak, on behalf of Quantum PT, is depicted below.

> (c) Lessee shall lease the Leased Space 2 day a week from the hours of (10 a.m. to 7 p.m.) (with each nine (9) hour period hereinafter being sometimes referred to as a "Scheduled Session"). Lessee shall use the Premises for at least two (2) Scheduled Sessions per week. The scheduling of the Scheduled Session is subject to change upon mutual agreement of Lessor and Lessee.

209. Likewise, although Chung was provided with access to the leased office space for six (6) days per week, the lease agreements required Chung, through Onepoint Acupuncture, to use the leased space for “at least three (3) Scheduled Sessions per week”, with Chung, through Carepoint Acupuncture, required to use the leased space for “at least one (1) Scheduled Sessions [sic] per week”.

210. A true and accurate excerpt from the form lease agreements between Chung, on behalf of Onepoint Acupuncture, and Birnhak, on behalf of Quantum PT, is depicted below.

> (c) Lessee shall lease the Leased Space six (6) days a week from the hours of (9 a.m. to 7 p.m.) (with each ten (10) hour period hereinafter being sometimes referred to as a "Scheduled Session"). Lessee shall use the Premises for at least three (3) Scheduled Sessions per week. The scheduling of the Scheduled Session is subject to change upon mutual agreement of Lessor and Lessee.

211. A true and accurate excerpt from the form lease agreements between Chung, on behalf of Carepoint Acupuncture, and Birnhak, on behalf of Quantum PT, is depicted below.

> (c) Lessee shall lease the Leased Space 6 day a week from the hours of (10 a.m. to 7 p.m.) (with each nine (9) hour period hereinafter being sometimes referred to as a "Scheduled Session"). Lessee shall use the Premises for at least one (1) Scheduled Sessions per week. The scheduling of the Scheduled Session is subject to change upon mutual agreement of Lessor and Lessee.

212. The inclusion of these terms in the lease agreements not only allowed Birnhak to exercise control over Manadan’s and Chung’s practices, but further ensured that patients were treated pursuant to the predetermined treatment protocol.

213. Likewise, the lease agreements between Quantum PT and RCK Medical limited Koffler's presence at the facilities located at (i) 794 Harrison Avenue, Riverhead, New York; (ii) 26 Sherman Avenue, New York, New York; (iii) 1308 Grand Avenue, Baldwin, New York; (iv) 139 North Central Avenue, Suite 4, Valley Stream, New York; (v) 175-43 Hillside Avenue, Jamaica, New York; and (vi) 1383 Veterans Memorial Highway, Hauppauge, New York to two (2) days per week.

214. Notably, although Koffler and RCK Medical were provided with non-exclusive access to the common areas, telephone instruments, and recorders, the lease agreements limited their use of the office space to an area of approximately 120 square feet, thus limiting the type of treatment (i.e., disability evaluations) that could be provided in conformity with the predetermined treatment protocol.

215. A true and accurate excerpt from the form lease agreements between Koffler, on behalf of RCK Medical, and Birnhak, on behalf of Quantum PT, is depicted below.

> 1.1. Leased Premises. The leased commercial office real estate (the "Premises") consists of an agreed area of approximately 120 rentable square feet located within the buildings known as *1308 Grand Avenue, Baldwin New York 11510.* Evaluation/Treatment Room 2 together with the non-exclusive right to use the Common Areas (as defined hereinbelow) appurtenant to the Premises and the Building. The Premises contain, for the exclusive use of Tenant, evaluation and treatment room(s) 2 days per week per calendar month.

216. As such, Birnhak caused these physicians to operate on a transient basis, wherein payments in the form of "rent" were issued in return for access to Quantum PT's patients.

217. These agreements created a symbiotic relationship, wherein Manadan, Chung, and Koffler gained access to patients that otherwise would not have been available, while Birnhak and

Castellano received "rental payments" and the necessary referrals to provide prolonged chiropractic and physical therapy treatment.

218. In addition to disguising the payments made to Quantum PT as "rent", the lease agreements negotiated by Birnhak on behalf of Quantum were designed to circumvent the issue of unlawful referrals of patients to providers at each location.

219. NY Public Health Law § 238-a prohibits certain healthcare service providers, including physicians, from referring the performance of services such as medical testing, diagnostic imaging, physical therapy, and other services to those with whom they have a financial relationship. *See* N.Y. Pub. Health L. § 238-a(1)(a).

220. However, Section 238-a contains several safe harbor provisions exempting certain enumerated compensation arrangements from the statute's prohibition.

221. Such provisions are particular in their application. For a financial arrangement to fall within a safe harbor, every specific requirement of the statute must be met.

222. One such provision allows for referral among healthcare providers even though one provider leases office space from another. For that provision to apply, there must exist a <u>written agreement</u> providing for a term of <u>at least one (1) year</u>, and the rent must be in an amount that is consistent with fair market value. *See* N.Y. Pub. Health L. § 238-a(5)(b)(i).

223. Moreover, rental payments and lease provisions may not vary based on the volume or value of any referrals. *See* N.Y. Pub. Health L. § 238-a(5)(b)(i).

224. In an effort to facially comply with this provision, each lease agreement entered into by the PC Defendants was in writing, for a term of at least one (1) year, and at a set monthly rate, regardless of the limit on the number of days that the provider was able to access the facility.

225. In furtherance of this scheme, Birnhak, on behalf of Quantum PT, entered into a series of Commercial Sub-Lease Agreements with CitiMed Management Services, Inc. ("CitiMed Management Services").

226. On the surface, these sub-lease agreements purport to provide CitiMed access to the facilities located at (i) 1308 Grand Avenue, Baldwin, New York; (ii) 794 Harrison Avenue, Riverhead, New York; (iii) 139 North Central Avenue, Suite 4, Valley Stream, New York; (iv) 175-43 Hillside Avenue, Jamaica, New York; and (v) 26 Sherman Avenue, New York, New York.

227. Likewise, Manadan, on behalf of New Millennium, entered into a separate Commercial Sublease Agreement with CitiMed Management Services for the use of the office space at 92-18 165th Street, Jamaica, New York.

228. More importantly, however, these agreements provide the PC Defendants with marketing services and access to additional patients that they otherwise would not have had access.

229. CitiMed, which promotes itself as "New York's Best Personal Injury Doctors, Workers' Compensation, Pain Management Specialists", operates more than 30 locations in the New York metropolitan area.

230. In conjunction with the aforementioned sub-lease agreements, CitiMed has listed these locations on their website while promoting Birnhak and Manadan as two (2) of their physicians.

231. Marina Katayeva ("Katayeva"), an employee of CitiMed Management Services, is further listed as the "Contact" for these locations.

232. In addition to serving as the point of contact at these locations, Katayeva purports to provide marketing services through NYPMR Marketing Inc. on behalf of NYPMR, LLC (New York Physical Medicine & Rehabilitation), of which Birnhak is a member.

### C. FRAUDULENT TREATMENT PROTOCOL

233. The success of the Defendants' scheme to defraud Allstate depended on their ability to submit numerous requests for No-Fault reimbursement for healthcare services purportedly rendered to patients.

234. Indeed, Birnhak and Castellano intentionally designed this scheme to revolve around so-called multi-disciplinary healthcare facilities to ensure that patients were subjected to numerous treatments for prolonged periods regardless of whether the patients needed—or even wanted—these services.

235. In furtherance of this scheme, each of the professional corporations operating from the multi-disciplinary facilities were caused to make referrals to the other PCs operating from that location, including the PC Defendants.

236. These referrals resulted in additional treatment, which, in turn, caused additional bills to be created and then submitted to Allstate seeking No-Fault reimbursement.

237. As such, the PC Defendants were not entitled to No-Fault reimbursement for these healthcare services, as these services were excessive, medically unnecessary, and rendered pursuant to a pre-determined protocol for the primary purpose of collecting payments from insurance companies such as Allstate.

238. The documents and invoices created and submitted to Allstate by, or on behalf of, the PC Defendants routinely misrepresented that the billed-for services were performed in a legitimate and clinically-reasonable manner.

239. Not only has this scheme injured Allstate, but the Defendants' purposeful provision of excessive and clinically unwarranted care also compromised and/or endangered the well-being of the patients that were subjected to these grossly unnecessary healthcare services.

240. In general, patients of the PC Defendants were involved in relatively minor motor vehicle accidents, in which many patients did not require emergency medical treatment.

241. Where patients sought treatment at an emergency room or an urgent care facility, the patients presented with few acute complaints in limited body regions.

242. In such cases, the relatively minor nature of the motor vehicle accidents would likely result in nothing more than self-limited soft tissue injuries, such as sprains, strains, or contusions.

243. While contusions typically heal within days to weeks, sprains and strains generally resolve within four (4) to six (6) weeks, with more severe cases recovering in approximately twelve (12) weeks.

244. Accordingly, appropriate care may involve a brief course of physical therapy **or** chiropractic care, followed by home exercises.

245. However, here, Allstate claimants frequently sought acute treatment with providers that added multiple complaints across various body regions, including Manadan, Umer Javaid, PA ("Javaid"), and Jacklyn Kelly, CRNP ("Kelly") of New Millennium.

246. These providers consistently documented complaints of neck pain radiating to the arm and back pain radiating to the leg with numbness and tingling.

247. Notably, these findings were typically absent from the medical records of other medical providers, with many treatment records specifically refuting the presence of such symptoms.

248. In addition, Manadan, Javaid, and Kelly commonly reported isolated numbness in one (1) upper and one (1) lower extremity, even though sensory deficits are not consistently documented by other healthcare providers who frequently document normal sensory examinations.

249. Nearly all patients were subsequently provided with multiple diagnoses that the pain management providers associated with motor vehicle accidents.

250. These diagnoses included cervical and lumbar disc disease, facet arthropathy, sprains/strains, myofascial pain, and "internal derangement" of multiple joints.

251. These diagnoses, however, are largely degenerative and unrelated to motor vehicle accidents.

252. The continued documentation of radicular complaints and findings was frequently used by the pain management providers to justify inappropriate electrodiagnostic testing of both the upper and lower extremities, followed by unnecessary epidural steroid injections.

253. As such, the pain management care provided, including the electrodiagnostic studies and injections, could not be medically justified as necessary or related to the motor vehicle accidents.

254. In accordance with the predetermined treatment protocol, Allstate claimants were referred for concomitant and excessive chiropractic treatment, physical therapy, and acupuncture, when appropriate treatment would consist of a brief course of physical therapy **or** chiropractic care, followed by home exercises.

255. In certain instances, Allstate claimants continued this course of treatment for multiple **years** despite the corresponding medical records indicating minimal progress, well beyond the six (6) to twelve (12) weeks of treatment that could be deemed appropriate.

256. In connection with this treatment, multiple MRI studies were commonly requested within days or weeks of the motor vehicle accidents, well before the expected resolution of soft tissue injuries and before adequate conservative care was provided.

257. The reports of pathology on the radiology reports, which largely reflect degenerative changes or possibly exaggerated findings, were then used by the pain management providers to justify their continued care with electrodiagnostic testing and injections.

258. In certain instances, the reports of pathology on the radiology reports contained exaggerated findings, which were then used by the pain management providers to justify continued care.

259. For example, in one instance, a patient was reportedly diagnosed with sprains of all knee ligaments in both knees, which would be unexpected without bilateral knee dislocations.

260. As such, the MRI studies were not only inappropriately ordered, but the readings by the radiologists were often atypical.

261. In connection with this treatment protocol, Manadan frequently and inappropriately administered epidural injections concomitantly with trigger point injections.

262. These injections should not be performed concurrently, as it confounds any diagnostic utility.

263. Further, the medical bills frequently listed separate charges for an epidurogram, which is a form of unbundling.

264. In one instance, Manadan performed an epidural injection on a 19-year-old patient who had no radicular complaint, and imaging revealed no neurocompressive pathology.

265. Injections in cases such as this would not be appropriate, as localized radicular complaints that correspond with objective findings of radiculopathy on examination and neurocompressive pathology on imaging are necessary.

266. Following the injections, Manadan and Javaid consistently claimed that the patients reported greater than 50% pain relief for over two (2) weeks, when other healthcare providers noted no improvement.

267. These findings were subsequently used to justify additional injections.

268. The pain management providers often reported joint injuries, most frequently involving the shoulder and knee, which are not consistently reflected in the acute treatment records.

269. Following early MRIs that typically showed degenerative changes, patients were evaluated by orthopedic providers at CitiMed Complete Medical Care, P.C. d/b/a CitiMed Diagnostic[1] ("CitiMed Diagnostic").

270. Nearly all of the patients evaluated by these orthopedists were reported to have the same symptoms and examination findings.

271. Statistically, it would be nearly impossible for these patients to have the same findings with provocative testing of the knees and shoulders.

272. Despite the improbability, the CitiMed Diagnostic orthopedists frequently concluded that patients had "symptomatic traumatic internal derangement resulting from a motor vehicle accident", including in cases of simple contusions or strains.

273. In these cases, degenerative findings in the shoulder or knee were frequently ignored in the assessment and plan for care.

274. Further, subsequent surgeries were often performed for degenerative conditions that were unrelated to the motor vehicle accidents.

[1] CitiMed Complete Medical Care, P.C. d/b/a CitiMed Diagnostic and CitiMed Management Services, Inc. are both owned and operated by Regina Moshe, M.D.

275. Postoperative care frequently involved medically unnecessary durable medical equipment (DME), including laser and ultrasound therapy devices and shoulder continuous passive motion ("CPM") machines, which were not warranted.

276. Likewise, the chiropractic treatment records document inappropriate DME orders, often within weeks of the motor vehicle accident, including lumbar orthoses, orthopedic seats, and cervical traction devices.

277. This equipment, however, is medically unnecessary and premature for patients expected to recover from soft tissue injuries.

278. Patients of the PC Defendants were frequently subjected to medically unnecessary impairment disability evaluations through RCK Medical, with most performed by Susan Zullo, D.C. ("Zullo") and Koffler[2].

279. The medical reports for these evaluations all inappropriately suggest a multitude of mostly unsupported diagnoses that the examiners attempt to link to the motor vehicle accidents, including possible "disc injuries" throughout the spine, cervical and lumbar radiculopathy, sprain/strain of the spine and multiple body parts, cephalgia, myofaciitis, myofascial pain syndrome, subluxation throughout the spine, and "possible injury" to multiple joints.

280. The examiners consistently suggest that all patients have a fair to guarded prognosis with total or partial disability.

281. In light of these findings, the examiners consistently recommended that the patients return to their treating providers for further care and diagnostic testing.

282. These reports, however, do not question the association between the diagnoses and the motor vehicle accidents, nor do they offer meaningful recommendations for alternative care.

---

[2] Koffler also maintains a residence in the State of New York; however, it appears that his most recent voter registration indicates that Florida is his primary residence.

283. As such, the reports appear to simply allow for additional charges and to justify the illegitimate care provided.

284. Accordingly, because of the misconduct described herein, the PC Defendants' claims for No-Fault reimbursement relating to these healthcare services are noncompensable under Insurance Law § 5102.

## D. EXEMPLAR CLAIMS

### i. Patient K.S. (Claim No. 0588046607)

285. Patient K.S. (Claim No. 0588046607) was purportedly involved in a motor vehicle accident on May 30, 2020 while bicycling.

286. As a result of the alleged accident, K.S. complained of right leg pain but declined medical attention at the scene.

287. On June 1, 2020, only two (2) days after the motor vehicle accident, K.S. was evaluated at New Millennium where she reportedly complained of pain in multiple areas, including the neck, right arm, mid and lower back, bilateral hips, bilateral knees, right ankle, and right foot.

288. K.S.'s complains purportedly included low back pain radiating to the right leg as well as neck pain radiating to the right arm with numbness and tingling. K.S. was further noted to have tenderness and decreased motion of multiple body parts.

289. At the conclusion of the examination, the 23-year-old patient was assessed with lumbar strain, thoracic strain, thoracic disc disease, cervical disc disease, cervical facet arthropathy (arthritis), cervical strain, right ankle derangement, bilateral knee internal derangement, bilateral hip derangement, right hip derangement, and myofascial pain as part of the predetermined treatment protocol.

290. K.S. was subsequently instructed by New Millennium to undergo both physical therapy and chiropractic treatment, as well as acupuncture, for an extended period of time.

291. In addition, K.S. was prescribed meloxicam, an anti-inflammatory medication, as well as cyclobenzaprine, a muscle relaxant.

292. Despite presenting only two (2) days after the accident, the provider noted that MRI studies would be considered as well as electromyography studies ("EMG") and injections.

293. On June 1, 2020, K.S. began a concurrent course of physical therapy and chiropractic treatment at Quantum PT.

294. Shortly thereafter, K.S. began undergoing acupuncture treatment through Onepoint Acupuncture.

295. This concomitant course of physical therapy and acupuncture treatment would subsequently continue for nearly three (3) years through June 9, 2023, despite the records indicating that K.S. had made minimal progress, well beyond the appropriate treatment period of six (6) to twelve (12) weeks.

296. On June 12, 2020, K.S. returned to New Millennium where she was evaluated by Manadan. At that time, K.S. was only two (2) weeks removed from the motor vehicle accident.

297. Manadan reported that K.S. complained of low-back pain radiating to the right left and neck pain radiating to the right arm with numbness and tingling.

298. However, the radiating complaints and numbness and tingling were not described in any specific dermatomal pattern.

299. In light of these findings, Manadan ordered MRI studies, including the cervical spine and lumbar spine. Manadan further indicated that he would consider electrodiagnostic studies.

300. Manadan's records for this date, however, do not describe any localized radicular findings on examination and do not describe any localized radicular complaint.

301. Consistent with the initial examination orders, K.S. underwent MRI studies of the right knee, right ankle, and right foot on June 17, 2020.

302. Although the right knee MRI was negative, the right ankle and right foot were noted to show a "micro trabecular fracture" in the dorsal and medial talus.

303. Such a finding would be consistent with the diagnosis of a bone bruise.

304. The MRI studies further revealed bone marrow edema in the lateral sesamoid right ankle.

305. As a result of Manadan's evaluation, K.S. underwent additional MRI studies of the cervical spine and lumbar spine on July 8, 2020.

306. Despite being 23 years-old, K.S. was reported to have bulging discs at C3-4 and C4-5, as well as a "broad, shallow, central herniation" at C5-6.

307. Notably, there was no interval change from a previous cervical spine MRI that was performed on November 23, 2019 prior to the motor vehicle accident.

308. Similarly, the lumbar spine MRI was reported to show a "central herniation" at L5-S1 as well as a bulging disc at L4-5.

309. The lumbar MRI study, however, also showed no interval changes from a prior study on November 23, 2019.

310. On July 10, 2020, K.S. returned to New Millennium where she was seen by Manadan. At that time, Manadan reported that the MRI studies of the cervical and lumbar spine showed disc herniations.

311. Manadan subsequently recommended and performed upper and lower extremity electrodiagnostic studies that were negative, without evidence of cervical or lumbar radiculopathy.

312. Despite these findings, Manadan continued to report that K.S. had nonspecific radiating pain complains with numbness and tingling and diminished sensation at the C8 and S1 dermatomes during subsequent evaluations.

313. Manadan did not correlate these findings with neurocompressive pathology on imaging, but still suggested that K.S. was a candidate for a lumbar epidural steroid injection "based on results of upper and lower EMG" as well a report of severe back and leg radicular pain lasting longer than three (3) weeks and unresponsive to anti-inflammatory medication and therapy.

314. Manadan subsequently performed the epidural steroid injection that he recommended along with a trigger point injection, with two (2) separate charges for epidurogram, on July 22, 2020. At the time of the injections, K.S. was less than two (2) months after the motor vehicle accident.

315. On August 29, 2020, K.S. underwent a chiropractic and acupuncture independent medical evaluation in which she was felt to have resolving sprain/strain injuries in multiple areas.

316. Although the chiropractor indicated that K.S. was capable of full duty of work and performing all of her daily activities, he concluded that eight (8) additional weeks of therapy and acupuncture were necessary.

317. An ensuing independent medical evaluation was performed by an orthopedic surgeon three (3) days later, in which K.S. was noted to have resolved sprains of the cervical and lumbar spine as well a resolved right knee contusion.

318. A review of the MRI studies revealed that K.S. had a "focal micro trabecular fracture of the dorsal medial aspect of the talus", and the evaluation noted that K.S. had a limited range of motion of the right ankle.

319. At the conclusion of the evaluation, the physician recommended four (4) additional weeks of physical therapy and noted that K.S. did not have any functional disability at the time of the evaluation.

320. Moreover, the physician did not indicate a need for any additional treatment for the cervical spine, lumbar spine, or right knee, and specifically did not suggest a need for any additional chiropractic or acupuncture treatment.

321. Despite these findings, the physical therapy and acupuncture treatment continued for nearly three (3) years in accordance with the predetermined treatment protocol.

322. On May 25, 2021, K.S. returned to New Millennium where a functional capacity evaluation was performed.

323. The records indicate range of motion and strength testing with reports of whole person impairment ranging from 14-20% for the lower extremities, cervical spine, and lumbar spine.

324. These findings, however, are not consistent with the independent medical evaluation that was previously performed on September 1, 2020, which noted a full range of motion of the cervical spine and lumbosacral spine in all planes.

325. K.S. ultimately continued to treat with Manadan, who consistently recommended further physical therapy, chiropractic treatment, acupuncture, and lumbar trigger point injections.

326. On January 25, 2022, Manadan reported that K.S. had greater than 50% pain relief for over two (2) weeks after one such injection, before recommending additional lumbar epidural and trigger point injections.

327. These injections were subsequently performed on February 8, 2022, with further physical therapy, chiropractic treatment, and acupuncture recommended.

328. On April 11, 2022, K.S. presented at RCK Medical after being referred for an injury certification report and impairment summary.

329. The corresponding report suggests that K.S. had positive clinical findings on examination with a guarded prognosis and partial disability.

330. At the conclusion of the examination, it was recommended that K.S. return to her treating provider for ongoing care.

331. Accordingly, on May 10, 2022, K.S. returned to New Millennium where Manadan again recommended additional physical therapy and chiropractic treatment.

332. Manadan further ordered a new MRI of the lumbar spine on June 7, 2022, despite no new complaints or exam findings described with regard to the lumbar spine.

333. K.S. subsequently underwent a new lumbar spine MRI on June 17, 2022 which purportedly showed a disc herniation at L5-S1, increased in size with a radial annular tear.

334. The disc was further noted to impress on both S1 nerve roots slightly greater on the right than the left, although the magnitude of impression was not described.

335. K.S. subsequently underwent a series of reevaluations with Manadan from June 28, 2022 through November 16, 2022, wherein Manadan continued to recommend further therapy, chiropractic treatment, acupuncture, and injections.

336. Although Manadan reported that K.S. complained of low back pain radiating to the right leg, a subsequent neurosurgical evaluation contradicted these findings, wherein it was noted that K.S. complained of low back pain radiating to the left lower extremity.

337. Manadan subsequently amended his findings during the re-evaluation on December 6, 2022, where he recommended and performed left lumbar facet injections from L3 to S1 at a charge of $22,500.00.

338. On January 24, 2023, K.S. returned to New Millennium wherein Manadan noted a new exam finding of "positive sacroiliitis on the left" and provided a new diagnosis of left sacroiliac joint disease.

339. As a result of these findings, Manadan performed a sacroiliac joint injection as well as a trigger point injection on January 25, 2023.

340. K.S. continued to treat with Manadan through May 16, 2023, with continued chiropractic treatment and physical therapy recommended at each visit.

341. The patient's medical records indicate that K.S. sustained a bone bruise of the right talus, sprains of the cervical and lumbar spine, and a right knee contusion related to the accident on May 30, 202.

342. The bone bruise would have been expected to resolve within approximately six (6) to twelve (12) weeks.

343. The sprains of the neck and back as well as the right knee contusion would have been expected to resolve within four (4) to six (6) weeks.

344. K.S. was noted to be recovered or nearly recovered at the time of the independent medical evaluation on September 1, 2020 with minimal limitation in her right ankle.

345. Although four (4) additional weeks of therapy were recommended at that time, K.S. continued to receive an excessive number of visits of physical therapy, chiropractic treatment, and acupuncture for nearly three years.

346. Likewise, the extensive pain management care provided by Manadan cannot be justified, especially wherein K.S. did not appear to have the radiculopathy to require pain management care.

347. As such, the records to not support the predetermined course of treatment that the PC Defendants placed the patient on, with the majority of this treatment being excessive and unrelated to the May 30, 2020 motor vehicle accident.

348. In connection with the treatment purportedly rendered to the claimant, the Defendants submitted documentation to Allstate through the U.S. Mail and/or interstate wires, supporting their demand for No-Fault reimbursement in connection with the services purportedly provided to K.S.

349. The documentation submitted to Allstate by the Defendants demonstrates that K.S. was subjected to excessive and medically unnecessary healthcare services during the relevant period.

**ii. <u>Patient M.D. (Claim No. 0633145446)</u>**

350. Patient M.D. (Claim No. 0633145446) was purportedly involved in a motor vehicle accident on June 18, 2021.

351. At the time of the purported motor vehicle accident, M.D. was a 44-year-old pedestrian that was struck by a motor vehicle that was backing out of a parking space.

352. As a result of the alleged accident, M.D. was transported to the Mt. Sinai South Multispecialty Care Center by ambulance where an initial evaluation was performed.

353. In connection with the initial evaluation, M.D. underwent x-rays of the left hip, left femur, and left knee.

354. Notably, M.D. did not undergo any x-rays of the neck, back, right shoulder, or right knee.

355. At the conclusion of the evaluation, M.D. was diagnosed with a quadriceps contusion and was treated with ketorolac, an anti-inflammatory, before being discharged.

356. On July 9, 2021, M.D. sought treatment at Quantum PT and further initiated acupuncture treatment with Onepoint Acupuncture.

357. M.D.'s medical records indicate that she continued this course of physical therapy and chiropractic treatment through July 6, 2023 and June 14, 2023, respectively.

358. On July 16, 2021, M.D. initiated care with Manadan at New Millennium wherein she reportedly complained of low back pain radiating to the left leg and neck pain radiating to the left arm with numbness and tingling.

359. The radiating pain and numbness and tingling were not described in any specific nerve root or peripheral nerve pattern.

360. Manadan reported that M.D. had decreased sensation in the C8 and S1 dermatomes.

361. Manadan further reported that M.D.'s left knee had tenderness to palpation without describing the specific location, and further suggested that the McMurray's test was positive.

362. As a result of the evaluation, Manadan provided multiple diagnoses, including cervical disc disease, cervical facet arthropathy, cervical sprain/strain, thoracic sprain/strain, thoracic disc disease, lumbar disc disease, lumbar facet arthropathy, lumbar sprain/strain, myofascial pain, left hip derangement, left knee internal derangement, and left ankle derangement.

363. In light of these findings, Manadan noted that MRI studies would be considered as well as electrodiagnostic studies and injections.

364. On August 3, 2021, M.D. was reevaluated by Manadan who reported that she had continued moderate to severe pain in multiple areas.

365. Manadan noted similar examination findings and again provided multiple diagnoses.

366. At that time, Manadan ordered multiple MRI studies consisting of the cervical spine, lumbar spine, and left ankle.

367. Moreover, Manadan recommended that M.D. continue both physical therapy and chiropractic treatment, and continued to indicate that electrodiagnostic studies and injections would be considered.

368. M.D. subsequently underwent the MRI studies on August 25, 2021, which purportedly showed disc "herniations" at multiple levels of the cervical spine.

369. The disc herniations were described in varied fashions, with a "central extruded" herniation at C3-4, a "central" disc herniation at C4-5, a "broad posterior disc herniation" at C5-6, and a "central" disc herniation at C6-7.

370. Right foraminal narrowing was reported at C4-5, C5-6, and C6-7, however the degree of foraminal stenosis was not quantified.

371. Similarly, disc "herniations" were purportedly identified at multiple levels of the lumbar spine, including a "broad" disc herniation at L2-43 and a "broad posterior subligamentous disc herniation" at L5-S1.

372. Although multiple levels of left sided foraminal narrowing was noted, the degree of narrowing was not quantified.

373. M.D. was subsequently reevaluated by Manadan on August 31, 2021 and September 10, 2021, wherein Manadan reported that M.D. continued to complain of moderate to severe pain in multiple areas.

374. At both visits, Manadan recommended that M.D. continue the course of physical therapy and chiropractic treatment.

375. During the September 10, 2021 reevaluation, Manadan added a diagnosis of lumbar radiculopathy and recommended upper extremity electrodiagnostic studies that were performed on the same date.

376. In addition, on September 10, 2021, Manadan ordered a left ankle MRI, which was subsequently performed on October 10, 2021.

377. Notably, M.D. did not undergo an x-ray of the left ankle when she was initially evaluated at the emergency room on June 18, 2021.

378. Likewise, on October 12, 2021, M.D. was re-evaluated by Manadan, who continued to report that M.D. had moderate to severe pain in multiple areas, including right shoulder pain.

379. The purported injury to M.D.'s right shoulder was never documented in Manadan's prior reports, with the first alleged complaint of pain in this area coming nearly four (4) months after the alleged motor vehicle accident.

380. In light of Manadan's report of decreased range of motion, M.D. was asked to consider a right shoulder MRI.

381. Moreover, Manadan's record indicates that plans for a left ankle MRI were further discussed, despite this MRI having been conducted two (2) days prior.

382. Pursuant to the predetermined treatment protocol, Manadan subsequently noted that M.D. had moderate to severe pain in multiple areas during the follow-up evaluations that occurred on November 30, 2021, December 21, 2021, and January 25, 2022.

383. During these visits and in accordance with the predetermined treatment protocol, M.D. was recommended to continue physical therapy and chiropractic treatment, and was further provided with prescription pain medications.

384. Despite being nearly thirteen (13) months removed from the motor vehicle accident, M.D. underwent an impairment and disability evaluation through RCK Medical on February 21, 2022.

385. The examiner subsequently concluded that M.D. had a guarded prognosis and was partially disabled.

386. Accordingly, it was recommended that M.D. return to her treating provider for ongoing care.

387. M.D. subsequently returned to New Millennium on March 1, 2022, wherein the same complaints of moderate to severe pain were noted.

388. Manadan ultimately recommended that M.D. continue the course of physical therapy and chiropractic treatment and noted that lumbar epidural steroid injections would be considered.

389. The patient's medical records indicate that M.D. likely sustained an isolated quadriceps contusion as a result of a low-speed motor vehicle accident.

390. This is supported by the emergency room records, which contain acute x-rays of the left hip, left thigh, and left knee, with only a diagnosis of a quadriceps contusion.

391. A quadriceps contusion would typically be a self-limited soft tissue injury, with most contusions recovering within days to weeks.

392. As M.D. did not seek additional treatment until July 9, 2021, the cascade of further care, consisting of acupuncture, physical therapy, chiropractic treatment, and pain management services cannot be seen to be medically necessary or related to the motor vehicle accident.

393. Manadan's early MRI studies for areas that were not identified as injuries when the patient first presented were utilized to subject the patient to extensive ongoing care with electrodiagnostic studies and recommendations for epidural steroid injections.

394. As such, there is no indication for medical care from July 9, 2021 onward, with none of the treatment rendered by Manadan being medically necessary.

395. In connection with the treatment purportedly rendered to the claimant, the Defendants submitted documentation to Allstate through the U.S. Mail and/or interstate wires, supporting their demand for No-Fault reimbursement in connection with the services purportedly provided to M.D.

396. The documentation submitted to Allstate by the Defendants demonstrates that M.D. was subjected to excessive and medically unnecessary healthcare services during the relevant period.

**iii. <u>Patient C.C. (Claim No. 0663107621)</u>**

397. Patient C.C. (Claim No. 0663107621) was purportedly involved in a motor vehicle accident on March 18, 2022.

398. As a result of the alleged motor vehicle accident, C.C., who was nine (9) weeks pregnant at the time, was transported by ambulance to the Mercy Hospital on the date of the loss.

399. On March 22, 2022, only four (4) days after the motor vehicle accident, C.C. presented at Quantum PT with complaints of neck and back pain.

400. Notably, the initial evaluation records do not include any complaints of pain in either shoulder.

401. The Quantum PT initial evaluation report indicates that C.C. reportedly portrayed diffusely diminished strength in the upper extremities at 3/5 bilateral, with lower extremity strength listed as 5/5 throughout.

402. At the conclusion of the evaluation, C.C. was diagnosed with neck and back pain with muscle spasm, with no report of radiculopathy.

403. In light of these findings, it was recommended that C.C. undergo a course of chiropractic treatment, physical, therapy, and massage therapy.

404. C.C. was further referred for orthopedic and neurology evaluations as well as MRI studies of the cervical spine, thoracic spine, and lumbar spine.

405. On March 23, 2022, C.C. was evaluated through CitiMed Diagnostic upon a referral by her attorney.

406. C.C. was given a nonspecific diagnoses of cervical, thoracic, lumbar, and bilateral shoulder pain and was referred for the predetermined course of physical therapy, chiropractic treatment, and acupuncture.

407. This course of treatment continued through at least January 9, 2023, nearly ten (10) months after the motor vehicle accident.

408. On April 18, 2022, C.C. underwent an impairment and disability evaluation at RCK Medical Services.

409. The corresponding "Injury Certification Report and Impairment Summary" notes that at the time of the evaluation, C.C. was purportedly under the care of Manadan through New Millennium.

410. The RCK Medical evaluation report notes that C.C. reportedly had new complaints of lower back pain radiating to the right and left lower extremity with numbness and tingling.

411. The report, however, does not describe the complaints in any particular nerve root or peripheral pattern.

412. As a result of the evaluation, C.C. was determined to be partially disabled and was recommended to return to her treating provider for ongoing care.

413. On July 21, 2022, C.C. underwent an ***initial*** evaluation with Manadan, despite Manadan being identified as her treating provider in the April 18, 2022 RCK Medical records.

414. At the time of the initial evaluation, C.C. reportedly had complaints of neck pain radiating to the left arm and low back pain radiating to the left leg with numbness and tingling.

415. These reported complaints, however, are inconsistent with the physiatry notes from only two (2) weeks prior.

416. Moreover, the complaints of radiating pain and numbness and tingling were not present at the time of the initial evaluation on March 22, 2022.

417. Manadan further reported a positive finding for the straight leg test, which is inconsistent with the negative result at the time of the initial evaluation.

418. As a result of the evaluation, Manadan provided numerous diagnoses, including cervical disc disease, cervical facet arthropathy, cervical sprain/strain, bilateral shoulder derangement, thoracic sprain/strain, thoracic disc disease, lumbar disc disease, lumbar facet arthropathy, lumbar sprain/strain, and myofascial pain.

419. Accordingly, Manadan recommended the predetermined course of physical therapy and chiropractic treatment, as well as MRI studies after pregnancy.

420. Similar complaints and findings were subsequently noted at the re-evaluation on August 8, 2022, with the same course of treatment recommended.

421. On September 8, 2022 (approximately one (1) month before giving birth), C.C. underwent a chiropractic and acupuncture evaluation, wherein the physician concluded that C.C. had resolved sprain/strain injuries of the cervical, thoracic, and lumbar spine and both shoulders.

422. Due to the evaluation, the physician opined that further chiropractic treatment and acupuncture were not necessary.

423. It was further determined that C.C. had no disability nor any restriction.

424. Additional testing, durable medical equipment, and treatment was further deemed unnecessary.

425. Despite these findings, C.C. continued the course of physical therapy, chiropractic treatment, and acupuncture at Quantum PT and Onepoint for an additional four (4) months until January 9, 2023.

426. Notably, this course of physical therapy, chiropractic treatment, and acupuncture remained consistent, even after C.C. gave birth on October 18, 2022.

427. C.C. further underwent new diagnostic imaging studies and continued pain management while under the care of Manadan through New Millennium.

428. This pain management treatment included an impairment test that was performed by Manadan on December 16, 2022.

429. Manadan subsequently concluded that C.C. was reported to have whole person impairment of 27%, with cervical impairment of 7%, lumbar impairment of 9%, left upper extremity impairment of 7%, and right upper extremity impairment of 7%.

430. Notably, these findings occurred two (2) months after C.C. gave birth and three (3) months after another physician had determined that C.C. had recovered from her injuries.

431. Despite C.C.'s injuries being deemed resolved, Manadan noted on January 9, 2023, that C.C. complained of severe mid back pain.

432. In light of these findings, Manadan recommended a thoracic epidural injection, which was subsequently performed on January 13, 2023.

433. At that time, Manadan further performed trigger point injections and an epidurogram at a charge of $7,500.00.

434. The patient's medical records indicate that C.C. likely sustained soft tissue sprains/strains of the neck and back and shoulders/trapezius muscles related to the motor vehicle accident.

435. These injuries are consistent with the location of the patient's initial symptoms and the reported findings on exam.

436. Injuries of this nature would typically be self-limited soft tissue injuries that would recover in approximately four (4) to six (6) weeks, with more severe sprains or strains taking approximately six (6) to twelve (12) weeks to recover.

437. A course of physical therapy or chiropractic treatment for the first six (6) to twelve (12) weeks would generally suffice for treatment of these self-limited soft tissue injuries.

438. As such, the patient's extensive course of physical therapy, chiropractic treatment, and acupuncture cannot be seen to be medically necessary.

439. Moreover, there was no indication for additional treatment when the patient's injuries were found to be resolved on September 8, 2022.

440. Accordingly, C.C. received an abundance of physical therapy, chiropractic treatment, acupuncture, and pain management that was medically unnecessary and unrelated to the motor vehicle accident of March 18, 2022.

441. This is further supported by Manadan's described complaints and examination findings, which are inconsistent with the complaints and examination findings noted by other providers.

442. In connection with the treatment purportedly rendered to the claimant, the Defendants submitted documentation to Allstate through the U.S. Mail and/or interstate wires, supporting their demand for No-Fault reimbursement in connection with the services purportedly provided to C.C.

443. The documentation submitted to Allstate by the Defendants demonstrates that C.C. was subjected to excessive and medically unnecessary healthcare services during the relevant period.

**iv. <u>Patient A.C. (Claim No. 0671657765)</u>**

444. Patient A.C. (Claim No. 0671657765) was purportedly involved in a motor vehicle accident on May 31, 2022.

445. As a result of the alleged motor vehicle accident, A.C., who did not lose consciousness, was transported by ambulance to the Northshore Hospital.

446. Upon arrival, a cervical spine CT scan was performed which reported to show only mild degenerative changes at C5-6, with no acute fracture.

447. At the conclusion of the evaluation, A.C. was provided with Tylenol and discharged from the emergency room.

448. On June 2, 2022, only three (3) days after the motor vehicle accident, A.C. presented at New Millennium and was evaluated by Jacklyn Kelly, CRNP ("Kelly").

449. The records from the initial evaluation suggest that A.C. had complaints of low back pain radiating to the left leg and neck pain radiating to the left arm with numbness and tingling.

450. A.C. was reported to have pain in the left shoulder, with nonspecific tenderness, decreased motion, and a positive Neer impingement sign and Hawkin's test.

451. As a result of the evaluation, A.C. was given numerous diagnoses, including lumbar disc disease, lumbar facet arthropathy, lumbar sprain/strain, cervical disc disease, cervical facet arthropathy, cervical sprain/strain, left shoulder derangement, post traumatic headache, and myofascial pain.

452. A.C. was recommended to start on a course of predetermined healthcare services including physical therapy and chiropractic treatment, with MRIs, electrodiagnostic studies, and injections to be considered.

453. On the same date, A.C. initiated physical therapy at Quantum PT.

454. This course of physical therapy would ultimately include an extensive number of visits through at least June of 2023, more than one (1) year after the motor vehicle accident.

455. On June 3, 2022, A.C. began acupuncture treatment through Onepoint Acupuncture.

456. Similarly, the acupuncture treatment ensued for an extended period of time, with the medical records indicating that A.C. received treatment over the course of thirteen (13) months through June of 2023.

457. On June 9, 2022, A.C. initiated chiropractic treatment at Quantum PT.

458. The record for the chiropractic initial evaluation indicates that A.C. had complaints of neck and back pain without radicular symptoms.

459. Notably, A.C. was found to have a normal sensory exam, which differs from the reported findings suggested by Kelly on June 2, 2022.

460. As a result of the evaluation, A.C. was diagnosed with pain and sprain of the neck and back.

461. This diagnoses, however, did not include cervical or lumbar radiculopathy.

462. In light of these findings, A.C. was recommended to continue chiropractic treatment in conjunction with the physical therapy and massage therapy.

463. At that time, A.C. was further referred to orthopedic, neurology, and pain management specialists, and was referred for MRI studies of the cervical spine, thoracic spine, lumbar spine, left knee, and left shoulder.

464. These MRI studies were ordered acutely, only nine (9) days after the motor vehicle accident and prior to the completion of a course of conservative treatment.

465. Despite the early referral, the MRIs of the left shoulder, lumbar spine, and cervical spine were conducted on June 23, 2022 through CitiMed Diagnostic.

466. The MRI studies purportedly revealed (i) tendinopathy of the rotator cuff – which is a degenerative condition – with no tear of the rotator cuff or the labrum; (ii) disc "herniations" through the entire lumbar spine at all levels; and (iii) disc "herniations" at multiple levels of the

cervical spine, with herniations reported at the C5-6, C6-7, and C7-T1 levels with disc bulging at C3-4 and C4-5.

467. On July 7, 2022, A.C. underwent additional MRIs of the left shoulder and thoracic spine, which were again performed at CitiMed Diagnostic.

468. The MRI studies purportedly revealed (i) a bone bruise of the femoral condyle, a tear of the posterior horn of the medial meniscus, and a strain of the medial collateral ligament; and (ii) bulging discs at multiple levels, including T7-8, T8-9, T9-10, and T12-L1.

469. On July 11, 2022, A.C. returned to New Millennium where Kelly noted that A.C. continued to report moderate to severe pain in multiple areas.

470. After reviewing the MRI studies, Kelly recommended that A.C. continue both physical therapy and chiropractic treatment and recommended transdermal diclofenac gel, Naprosyn, and cyclobenzaprine.

471. The records indicate that electrodiagnostic studies and injections would be considered.

472. Notably, A.C. returned to CitiMed Diagnostic for follow-up evaluations on July 13, 2022, August 24, 2022, and September 12, 2022.

473. During these visits, the treating physicians' findings differed from those of Kelly at New Millennium.

474. Specifically, the CitiMed Diagnostic records note that the sensory exam was intact and indicate that the Spurling's sign and straight leg raise testing were negative.

475. While the CitiMed Diagnostic records note that the left shoulder MRI showed rotator cuff tendinosis, which is a degenerative condition, there was no numbness or loss of sensation, no tingling, and no weakness.

476. Kelly, however, had previously reported that the exam showed tenderness over the posterolateral acromion, decreased motion, decreased strength, and positive Neer's impingement, Hawkin's, Speed's, and Yorgason's tests.

477. A.C. was ultimately diagnosed with "left shoulder symptomatic traumatic internal derangement resulting from a motor vehicle accident" at CitiMed Diagnostic despite the fact that the MRI did not reflect any significant structural derangement.

478. Beginning on September 16, 2022, A.C. began seeing Manadan at New Millennium on a monthly basis.

479. At that time, Manadan suggested that A.C. had impairments of 12% for the cervical spine, 18% for the lumbar spine, 6% for the left upper extremity, and 4% for the right upper extremity, with a whole person impairment given as 35%.

480. During these visits, Manadan reported that A.C. continued to complain of moderate to severe pain in multiple areas. Manadan's evaluation reportedly revealed decreased sensation in the C8 and S1 dermatomes, with positive Spurling's test and a positive straight leg raise test.

481. Such findings, however, are inconsistent with the findings from CitiMed Diagnostic.

482. In light of these findings, Manadan noted that A.C. was a candidate for lumbar epidural steroid injections, which he subsequently performed.

483. Consistent with the predetermined treatment protocol, Manadan continuously recommended ongoing physical therapy and chiropractic treatment, and suggested consideration of a percutaneous discectomy procedure.

484. In each instance, Manadan's records do not reflect any significant changes from the prior visit and no changes in the recommendations.

485. Likewise, when A.C. was evaluated by Umer Javaid, PA ("Javaid") at New Millennium on April 25, 2023, Javaid noted similar complaints and exam findings as previously reported by Manadan.

486. In addition to the same diagnoses being given, A.C. was provided with the same recommended course of treatment, with the only addition being a new offering of a cervical epidural steroid injection.

487. On May 4, 2023, A.C. underwent an independent medical evaluation wherein the examiner noted that A.C. complained of pain in the neck, back, left shoulder, left hip/buttock, and left knee/leg.

488. There was no report of radicular symptoms in the upper extremity and A.C. specifically had no numbness or tingling.

489. This history of no radiating pain to the left arm and no numbness and tingling differs from the reported symptoms suggested by Javaid of New Millennium just nine (9) days after the motor vehicle accident.

490. The independent medical evaluation revealed normal motion of the cervical spine, normal neurologic exam, and normal reflexes.

491. The neurovascular status was suggested to be intact with no report of numbness as suggested in the New Millennium notes.

492. Further, the Spurling's test was negative despite the reports of positive Spurling's tests in the New Millennium records.

493. The evaluation of multiple other areas, including the thoracic spine, lumbar spine, right shoulder, left shoulder, right elbow, left elbow, right wrist, right hand, left wrist, left hand,

right hip/buttock, left hip/buttock, right knee/leg, left knee/leg, right ankle, right foot, left ankle, and left foot appeared normal throughout.

494. As such, A.C. was determined to have resolution of the sprains or strains of the cervical spine, thoracic spine, lumbar spine, left shoulder, left knee, and left hip/buttock, with no evidence of any orthopedic disability or restriction on his day-to-day activity.

495. Further, it was determined that there was no additional need for further care, including physical therapy, massage therapy, durable medical equipment, diagnostic testing, surgery, injections, or prescription medications.

496. Despite these findings, A.C. continued the course of physical therapy and chiropractic treatment at Quantum PT, as well acupuncture at Onepoint Acupuncture.

497. Moreover, despite the independent medical evaluation findings that A.C.'s injuries had resolved, A.C. returned for a visit with Manadan on June 6, 2023, who continued to suggest that A.C. had reports of radiating pain to the left leg and the left arm with numbness and tingling.

498. In addition to recommending the ongoing course of physical therapy and chiropractic treatment, Manadan offered and performed a cervical epidural injection, at a charge of $11,000.00, despite the lack of indications for the procedure.

499. The patient's medical records indicate a mechanism suggestive of sprain/strains related to the motor vehicle accident.

500. While it is possible that A.C. sustained sprains/strains of the neck and back as well as possible strains of the left shoulder, left knee, and left hip, these sprains or strains would be self-limited soft tissue injuries that would generally recover within four (4) to six (6) weeks.

501. As more severe sprains or strains may take approximately twelve (12) weeks to recover, A.C. likely would not have required ongoing care beyond six (6) to twelve (12) weeks after the accident.

502. The medical records indicate that A.C. inappropriately underwent multiple MRI studies before a conservative course of care.

503. The records suggest that these studies were utilized to justify the ongoing extensive care for A.C., which included highly excessive number of visits for physical therapy, chiropractic treatment, and acupuncture.

504. These records further indicate that A.C. was diagnosed with symptoms (e.g., radicular symptoms) that were not documented consistently by other providers.

505. A.C. was further caused to undergo inappropriate electrodiagnostic studies as well as inappropriate cervical and lumbar epidural steroid injections.

506. As such, this treatment cannot be justified as medically necessary or related to the May 31, 2022 motor vehicle accident.

507. In connection with the treatment purportedly rendered to the claimant, the Defendants submitted documentation to Allstate through the U.S. Mail and/or interstate wires, supporting their demand for No-Fault reimbursement in connection with the services purportedly provided to A.C.

508. The documentation submitted to Allstate by the Defendants demonstrates that A.C. was subjected to excessive and medically unnecessary healthcare services during the relevant period.

v. **<u>Patient K.T. (Claim No. 0677425290)</u>**

509. Patient K.T. (Claim No. 0677425290) was purportedly involved in a motor vehicle accident on July 10, 2022.

510. As a result of the alleged motor vehicle accident, K.T. did not require medical attention at the scene nor did he undergo acute care.

511. Rather, K.T. treated himself from home conservatively for a few days before ultimately seeking an evaluation from his primary care physician.

512. On July 21, 2022, K.T. presented at New Millennium where he was examined by Kelly.

513. Kelly's initial evaluation report notes that K.T. had complaints of low back pain radiating to the right leg and neck pain radiating to the right arm with numbness and tingling.

514. K.T. was reported to have decreased sensation in the C7 and S1 dermatomes as well as multiple other abnormal exam findings.

515. K.T. was given multiple diagnoses, including posttraumatic headaches, lumbar disc disease, lumbar facet arthropathy, lumbar sprain/strain, cervical disc disease, cervical facet arthropathy, cervical sprain/strain, thoracic sprain/strain, thoracic disc disease, bilateral shoulder derangement, bilateral knee internal derangement, left ankle derangement, and myofascial pain.

516. As a result of these findings, Kelly recommended that K.T. commence the predetermined treatment protocol including physical therapy, chiropractic treatment, MRI studies, electrodiagnostic studies, and injections.

517. K.T. was subsequently prescribed Naprosyn, an anti-inflammatory medication, as well as diclofenac gel.

518. In accordance with the predetermined treatment protocol, K.T. initiated care with Quantum PT on the same date.

519. The initial physical therapy record notes complaints of pain in the neck, back, shoulders, knees, and left ankle, but does not indicate radiating pain complaints or radicular symptoms, in contrast to Kelly's findings.

520. K.T. would subsequently undergo an extensive course of physical therapy and chiropractic treatment at Quantum PT through April of 2023, more than eight (8) months after the motor vehicle accident.

521. On July 26, 2022, K.T. began acupuncture treatment through Onepoint Acupuncture, which would ultimately continue through March of 2023.

522. On the same date (i.e., July 26, 2022), K.T. began a course of massage therapy at Quantum PT that continued for more than four (4) months through December of 2022.

523. Although Kelly's initial evaluation report notes that MRI studies would be considered, MRIs of the cervical spine, lumbar spine, and left shoulder were performed on July 27, 2022, only two (2) and a half weeks after the motor vehicle accident.

524. The MRIs, which were performed at CitiMed Diagnostic, indicate that the studies were ordered by Kelly.

525. The radiologist subsequently reported that the cervical spine MRI showed "productive changes" at the C4-5 and C5-6 levels, likely associated with a posterior disc "herniation" at C5-6 with no neural foraminal encroachment.

526. The lumbar spine was also noted to show "productive changes" with disc "herniations" at multiple levels, specifically at T12-L1 and L5-S1.

527. Disc bulging was further noted at L3-4, with neural foraminal encroachment at L4-5.

528. The L5-S1 level was also noted to have herniations affecting both S1 nerve roots.

529. However, there was no report of an acute pars fracture and the radiologist did not indicate if this relatively young patient had a pars defect, as it would be unlikely for 33-year-old to have multiple disc herniations.

530. Lastly, the MRI of the left shoulder reportedly showed tendinopathy of the rotator cuff with a report of an anterior leading edge partial tear of the supraspinatus.

531. This, however, is a common description of degenerative rotator cuff pathology.

532. On August 5, 2022, K.T. was reevaluated by Manadan at New Millennium, who continued to note that K.T. reported symptoms previously described by Kelly.

533. Manadan noted that K.T. reported moderate to severe pain in multiple areas, had multiple abnormal exam findings, and reportedly had numbness in the C7 and S1 dermatomes, as well as tenderness over the knees with a positive McMurray's test bilaterally.

534. K.T. was reported to have tenderness over the ankles with negative anterior drawer testing and nonspecific tenderness with decreased motion in the right shoulder.

535. As such, Manadan repeated the multiple diagnoses previously suggested by Kelly and recommended the same course of treatment (i.e., continued physical therapy and chiropractic care).

536. Manadan further noted that lower extremity electrodiagnostic studies would be performed and that injections would be considered.

537. K.T., however, was less that one (1) month removed from the motor vehicle accident when Manadan recommended and subsequently performed the electrodiagnostic testing.

538. This testing purportedly showed slightly increased spontaneous activity of the medial gastrocnemius muscle and left peroneus longus muscle, which Manadan stated was consistent with bilateral S1 radiculitis.

539. In light of these findings, Manadan noted consideration for an epidural injection at the L5-S1 level.

540. In connection with his treatment, Manadan referred K.T. to an orthopedist to evaluate the left shoulder pain.

541. Notably, the orthopedist noted that K.T. "denies any significant distal weakness, numbness, or paresthesia of the involved upper extremity", which differs from the reported symptoms suggested in the notes of Kelly and Manadan.

542. K.T. was further referred for multiple impairment summary evaluations that were performed through RCK Medical.

543. Each report indicates multiple working diagnoses and suggest "possible disc injury" in the cervical spine and lumbar spine, thoracic and lumbar sprain/strain, cephalgia, myofaciitis, myofascial pain syndrome, subluxation syndrome throughout the spine, and possible injury of sprain/strain for the shoulders and knees.

544. In each report, the examiner (i.e., Christopher Nguyen, D.C. and Koffler) indicated that the patient had a guarded prognosis and that K.T. was totally disabled.

545. At the conclusion of each evaluation, it was recommended that K.T. return to the treating provider for ongoing care.

546. However, these records do not reflect any concerns regarding the care that K.T. was purportedly receiving nor do they suggest alternative treatment.

547. On August 29, 2022, K.T. returned to New Millennium where he was reevaluated by Kelly.

548. Kelly noted that K.T. reported complaints of moderate to severe pain in multiple areas, with abnormal exam findings again reported with diminished sensation in C7 and S1 dermatomes and reports of weakness in the same myotomes.

549. Consistent with the predetermined treatment protocol, Kelly recommended that K.T. continue the course of ongoing physical therapy and chiropractic treatment and indicated that an epidural steroid injection would be considered.

550. K.T. was further ordered to undergo MRI studies of the right shoulder, left knee, and right knee, which were subsequently performed at CitiMed Diagnostic on September 10, 2022.

551. The MRI of the right shoulder showed essentially the same findings that were noted for the left shoulder on July 27, 2022, while the left knee MRI showed intact menisci and intact ligaments.

552. The MRI of the right knee purportedly revealed a "grade II 'intrameniscal tear' of the posterior horn of the medial meniscus", while the ligaments were reported to be intact.

553. K.T. subsequently continued to treat at New Millennium on a monthly basis, where reports of moderate to severe pain in multiple areas and multiple abnormal findings on exam were continuously noted.

554. Likewise, the same multiple diagnoses and recommendations for continued physical therapy and chiropractic treatment were documented at each visit.

555. On September 22, 2022, Manadan ordered shock wave therapy treatment for these injuries, despite being atypical and with no quality scientific literature to supports its efficacy in this setting.

556. During the reevaluation on October 19, 2022, Manadan recommended and performed a lumbar epidural injection.

557. Notably, on November 17, 2022, Manadan documented that the injection provided "greater than 50% pain relief for over two weeks" but indicated that the shot reportedly increased K.T.'s blood sugar.

558. Despite the adverse reaction, Manadan indicated that additional epidural injections would be considered at the conclusion of the visit.

559. The patient's medical records indicate that the patient, K.T., had a mechanism of injury that could cause minor strains of the neck and back, and potentially to the shoulders or knees.

560. These would be self-limited soft tissue injuries that would generally recover within four (4) to six (6) weeks.

561. More severe sprains or strains may take up to twelve (12) weeks to recover.

562. As such, K.T. would have been expected to recover from any self-limited soft tissue sprains or strains within approximately six (6) to twelve (12) weeks.

563. A short course of physical therapy <u>or</u> chiropractic treatment would be typical treatment or patients to allow for recovery.

564. In this case, K.T. was caused to undergo excessive amounts of concomitant treatment with both physical therapy and chiropractic treatment, in addition to massage therapy and acupuncture.

565. These treatments exceeded the timeframe after which the soft tissue injuries would have been expected to resolve.

566. As such, the majority of these treatments are medically unnecessary and not related to the July 10, 2022 motor vehicle accident.

567. Moreover, K.T. was referred for inappropriately early MRI studies that were performed well before a course of conservative treatment could be completed.

568. These studies and the inconsistent findings documented in the New Millennium medical records were then utilized to justify the later electrodiagnostic testing and epidural injections.

569. Accordingly, K.T. received numerous pain management evaluations and testing that were medically unnecessary and were rendered pursuant to the predetermined treatment protocol.

570. In connection with the treatment purportedly rendered to the claimant, the Defendants submitted documentation to Allstate through the U.S. Mail and/or interstate wires, supporting their demand for No-Fault reimbursement in connection with the services purportedly provided to K.T.

571. The documentation submitted to Allstate by the Defendants demonstrates that K.T. was subjected to excessive and medically unnecessary healthcare services during the relevant period.

**vi. <u>Patient G.C. (Claim No. 0728020256)</u>**

572. Patient G.C. (Claim No. 0728020256) was purportedly involved in a motor vehicle accident on August 8, 2023.

573. As a result of the alleged motor vehicle accident, G.C. did not require immediate medical attention nor did he present at an emergency room or urgent care facility on that date.

574. Rather, on August 11, 2023, G.C. initiated acupuncture treatment with Onepoint Acupuncture.

575. G.C.'s course of acupuncture ultimately continued at Onepoint Acupuncture through November 2, 2023.

576. On August 21, 2023, G.C. underwent an impairment disability evaluation through RCK Medical.

577. Notably, the record indicates that G.C. was under the care of Birnhak at the time of the evaluation, with documented complaints of headaches, neck pain, right shoulder pain, and midback pain.

578. The records do not document complaints of radiating pain or numbness and tingling to suggest radiculopathy.

579. G.C.'s strength, sensation, and reflexes were all found to be within normal limits.

580. Despite these findings, G.C. was nevertheless given multiple working diagnoses in the disability evaluation, including a suggestion of cervical radiculopathy.

581. At the conclusion of the evaluation, it was suggested that G.C. was partially disabled with a guarded prognosis, and G.C. was recommended to return to his treating provider for ongoing care.

582. On September 6, 2023, G.C. presented at New Millennium where he was evaluated by Manadan.

583. Consistent with the predetermined treatment protocol, Manadan reported that G.C. complained of neck pain radiating to the right arm and low back pain radiating to the right leg with numbness and tingling.

584. Manadan further indicated that sensation to pin prick was diminished in the C7 and the L5 dermatomes.

585. G.C. was given multiple diagnoses, including cervical disc disease, cervical facet arthropathy, cervical sprain/strain, right shoulder derangement, thoracic sprain/strain, thoracic disc disease, lumbar disc disease, lumbar facet arthropathy, lumbar sprain/strain, and myofascial pain. Manadan recommended physical therapy and chiropractic treatment.

586. Although G.C. was seen less than one (1) month after the August 8, 2023 accident, Manadan ordered MRI studies of the cervical spine, right shoulder, and lumbar spine, and noted that electrodiagnostic studies and injections would be considered.

587. On September 7, 2023, G.C. was evaluated at Quantum PT where he reportedly complained of neck, back, and right shoulder pain.

588. Despite Manadan's report that G.C. had radiating pain complaints to the right arm and right leg, the September 7, 2023 evaluation report does not indicate radicular symptoms for either the upper or lower extremity.

589. Moreover, there were no reports of an abnormal sensory exam and no diagnoses of radiculopathy by the chiropractor.

590. On September 25, 2023, G.C. was seen at RCK Medical for a follow-up impairment disability examination.

591. The examination records indicate that G.C. noted complaints of neck, midback, and right shoulder pain.

592. Notably, there is no report of radicular symptoms in the history despite the reported radicular symptoms noted by Manadan.

593. G.C. was subsequently given multiple diagnoses, including possible disc injury and radiculopathy despite the lack of radicular complaints or findings.

594. Although G.C. indicated that he had returned to work since the date of the accident, the report nevertheless notes that G.C. had a guarded prognoses and was considered partially disabled.

595. G.C. was recommended to return to his treating provider for ongoing treatment.

596. On September 28, 2023, G.C. underwent MRI studies of the cervical spine, lumbar spine, and right shoulder.

597. As a result of the MRI of the cervical spine, G.C. was noted to have a right posterolateral disc herniation at C4-5 causing stenosis of the right C5 nerve root, and a broad posterior "subligamentous disc herniation" at C5-6, slightly narrowing the left greater than the right foramen.

598. The radiologist further reported a "right peripheral subligamentous disc herniation" at C6-7 abutting the right C7 nerve root, with desiccation of the discs at C6-7, spur formation at C5-6, and a disc bulge noted at C3-4.

599. The MRI of the lumbar spine showed diffuse bulging at L4-5 and L5-S1 with the bulging at L5-S1 "extending to nearly about the L5 nerve roots." Disc bulging was likewise reported at L1-2 and L3-4. Lumbar straightening was found to be present with reports of muscle spasm.

600. In addition, the MRI of the right shoulder showed tendinosis/tendinopathy of the supraspinatus with associated interstitial partial tearing.

601. Fluid was reported within the long head of the biceps tendon sheath.

602. Acromioclavicular arthritis was seen as well as a downsloping acromion abutting the underlying supraspinatus.

603. The report, however, does not indicate any posttraumatic findings as the interstitial tearing is an attritional finding often noted with degenerative tendinopathy.

604. On October 23, 2023, G.C. was reevaluated by Javaid through New Millennium. The records note the same complaints, examination findings, and diagnoses.

605. G.C. was again recommended to continue physical therapy and chiropractic care.

606. The report notes that electrodiagnostic studies would be scheduled and that epidural steroid injection and trigger point injections were offered.

607. An impairment disability reevaluation through RCK Medical was subsequently performed on November 1, 2023, in which the same complaints and conclusions were noted.

608. Despite having returned to work, G.C. was again noted to have a guarded prognosis with partial disability.

609. In connection with the predetermined treatment protocol, G.C. was reevaluated by Javaid on November 30, 2023, in which the same subjective symptoms, objective findings, assessment plan, and plan for care were documented.

610. The plan for electrodiagnostic studies was further noted, as well as the offer for the epidural and trigger point injections, which G.C. declined.

611. The report notes, however, that G.C. was considering surgery for the right shoulder.

612. A nearly identical reevaluation was performed by Javaid on January 8, 2024.

613. On January 19, 2024, G.C. was evaluated by Manadan, who again noted the same subjective and objective findings.

614. The records indicate that at this visit, Manadan conducted electrodiagnostic testing for the lower extremities, which revealed no evidence of radiculopathy despite the reported radiating symptoms to the right leg and foot and the reported decreased sensation in the L5 dermatome.

615. On January 31, 2024, only twelve (12) days later, G.C. was seen again by Manadan who noted the same subjective complaints and objective findings.

616. G.C. was again offered an epidural steroid injection as well as trigger point injections, which were declined.

617. The records indicate that G.C. was considering surgery for the right shoulder.

618. On February 18, 2024, G.C. underwent a new MRI of the right shoulder.

619. The radiologist continued to note rotator cuff tendinopathy with associated interstitial partial thickness tearing.

620. These findings, however, are most often degenerative and not associated with trauma.

621. The radiologist did not describe significant biceps tenosynovitis, but rather reported only "opacity of fluid within the long head of the biceps tendon sheath."

622. There was no report of tearing or instability of the bicep.

623. The radiologist further noted findings of acromioclavicular arthritis as well as a curved acromion with associated impingement on the supraspinatus.

624. The MRI did not describe any posttraumatic abnormalities.

625. On March 7, 2024, G.C. sought a second orthopedic opinion for the right shoulder, which showed a full range of motion and 5/5 strength, with a positive impingement sign and a positive Hawkin's test.

626. The orthopedist further reviewed the MRI studies and noted that he did not see enough on the MRIs to justify surgical treatment.

627. G.C. was subsequently discharged from care and instructed to follow up as needed.

628. The patient's medical records indicate that the patient, G.C., likely sustained strains of the neck and back related to the motor vehicle accident.

629. G.C. may have also sustained a strain of the right shoulder musculature.

630. These sprains or strains would be self-limited soft tissue injuries that would have recovered within approximately four (4) to six (6) weeks, with more severe strains or sprains resolving in up to approximately twelve (12) weeks.

631. It does not appear that G.C. sustained traumatic disc pathology as a result of the accident, as the records do not indicate consistent localized symptoms or findings of radiculopathy associated with neurocompressive pathology on imaging.

632. As such, treatment beyond six (6) to twelve (12) weeks cannot be seen to be medically necessary nor related to the motor vehicle accident.

633. Further, G.C. was offered right shoulder surgery for a rotator cuff tendinopathy and impingement that would be unrelated to the accident.

634. This is supported by the findings of the orthopedist that provided the second opinion.

635. In connection with the treatment purportedly rendered to the claimant, the Defendants submitted documentation to Allstate through the U.S. Mail and/or interstate wires, supporting their demand for No-Fault reimbursement in connection with the services purportedly provided to G.C.

636. The documentation submitted to Allstate by the Defendants demonstrates that G.C. was subjected to excessive and medically unnecessary healthcare services during the relevant period.

**vii. <u>Patient S.A. (Claim No. 0728289265)</u>**

637. Patient S.A. (Claim No. 0728289265) was purportedly involved in a motor vehicle accident on September 5, 2023.

638. As a result of the accident, S.A. was transported by ambulance to Mt. Sinai South Nassau Hospital.

639. The emergency room records indicate that S.A.'s motor vehicle had minor exterior damage to the front bumper and that the airbag did not deploy.

640. The emergency room records further indicate that S.A. complained of left hip pain, with no reports of pain in the neck or back.

641. The cervical, thoracic, and lumbosacral examination was reported to be normal.

642. Both of S.A.'s arms and both legs, apart from the left hip, were likewise reported to be normal.

643. S.A. was subsequently transported to the South Nassau Community hospital for further evaluation.

644. Although the records note that x-rays of the chest and hip were taken, it does not appear that S.A. required any x-rays of the neck, back, or either shoulder.

645. On September 6, 2023, only one (1) day after the motor vehicle accident, S.A. initiated care with Manadan through New Millennium.

646. Manadan noted that S.A. reported complaints of neck pain radiating to the left arm and low back pain radiating to the left leg with numbness and tingling.

647. These symptoms, however, were not described in the ambulance records and are not consistent with the complaints noted in the hospital records.

648. Manadan further reported that S.A. had decreased sensation in the C8 and L5 dermatomes.

649. As such, Manadan provided multiple diagnoses, including cervical disc disease, cervical facet arthropathy, cervical sprain/strain, left shoulder derangement, lumbar disc disease, lumbar facet arthropathy, lumbar sprain/strain, myofascial pain, and left knee internal derangement.

650. Manadan recommended that S.A. begin a course of physical therapy and chiropractic treatment, and noted that MRI studies, electrodiagnostic tests, and injections would be considered.

651. On the same date, S.A. initiated care with Quantum PT, which ultimately spanned 42 visits through March 20, 2024.

652. The initial evaluation report completed at Quantum PT indicates that S.A. had complaints of neck pian with radicular symptoms, low back pain, left hip pain, left knee pain, and left shoulder pain. Radicular symptoms were not described in any particular nerve root pattern.

653. Consistent with the treatment protocol, S.A. subsequently initiated treatment with Onepoint Acupuncture on September 8, 2023.

654. The treatment at Onepoint Acupuncture subsequently spanned at least 37 dates of service through January 29, 2024.

655. On September 25, 2023, S.A. presented at RCK Medical for an impairment disability evaluation.

656. At that time, S.A. was less than three (3) weeks after the motor vehicle accident.

657. The RCK Medical records indicate that S.A. was under the care of Birnhak. S.A. was ultimately given multiple working diagnoses, including possible disc injuries and cervical and lumbar radiculopathy, as well as myofascial pain syndrome and possible injuries to the left shoulder and knee.

658. S.A. was overall reported to be partially disabled with a guarded prognosis, and was recommended to continue treating with her treating provider.

659. On October 2, 2023, S.A. returned to New Millennium wherein she was evaluated by Javaid.

660. The records reflect the same subjective and objective findings that were previously noted by Manadan.

661. Moreover, the same assessment and treatment plans were documented, with plans for continued physical therapy and chiropractic treatment.

662. Despite being less than one (1) month after the motor vehicle accident, Javaid ordered multiple MRI studies, including the cervical spine, lumbar spine, and left shoulder.

663. S.A. subsequently underwent the MRI study of the left shoulder on October 6, 2023.

664. The left shoulder MRI for the 79-year-old patient was reported to show a full thickness supraspinatus tear with mild supraspinatus atrophy.

665. A long head biceps tendon tear was also noted with an empty bicipital groove and a moderate glenohumeral joint effusion.

666. The MRI showed no fracture, and the articular cartilage was reported to be intact.

667. The acromiohumeral interval was reported to be decreased, a finding that is often noted with chronic rotator cuff tears and associated atrophy.

668. Lastly, a moderate amount of fluid was reported in the subacromial/subdeltoid bursa.

669. On October 20, 2023, S.A. underwent the MRI of the lumbar spine.

670. The radiologist noted that this study showed bulging discs at L1-2, L2-3, L3-4, L4-5, and L5-S1. Mild bilateral foraminal stenosis was noted at L3-4 and L4-5, with left foraminal herniation at L5-S1 impinging the existing L5 root.

671. Lastly, on October 24, 2024, S.A. underwent the MRI of the cervical spine.

672. The radiologist noted that S.A. had multilevel disc herniations, which were described as central or broad at C3-4, C4-5, C5-6, and C6-7. A bulging disc was noted as C7-T1.

673. The radiologist suggested that there was impingement upon multiple nerve roots through the cervical spine from the central and broad herniations.

674. Further, the radiologist noted disc desiccation throughout the cervical spine, which would be consistent with degenerative disc disease.

675. On November 6, 2023, S.A. was reevaluated by Javaid, who noted the same subjective complaints and objective findings.

676. In light of the MRI findings, Javaid recommended continued physical therapy and chiropractic treatment, with electrodiagnostic studies to be scheduled, and injections to be considered.

677. On December 1, 2023, S.A. was caused to undergo an additional impairment disability evaluation through RCK Medical, wherein S.A. was reported to be partially disabled with a guarded prognosis.

678. S.A. was again recommended to return to her treating provider for ongoing treatment.

679. Accordingly, on December 4, 2023, S.A. returned to New Millennium where she was reevaluated by Javaid.

680. Javaid again noted the same subjective complaints and exam findings, and further recommended additional physical therapy and chiropractic treatment.

681. The medical records indicate that electrodiagnostic studies would again be scheduled, with S.A. declining the epidural steroid injection and trigger point injections.

682. On December 12, 2023, only eight (8) days later, S.A. was evaluated by Manadan, who also documented the same subjective and objective findings.

683. On this date, however, Manadan performed the electrodiagnostic testing, which he stated showed bilateral L5-S1 radiculitis.

684. Manadan further reported that multiple left and right muscles showed slightly increased spontaneous activity.

685. On December 20, 2023, only eight (8) days later, Manadan again evaluated S.A., wherein he documented the electrodiagnostic findings.

686. In light of these findings, Manadan added an assessment of lumbar radiculopathy. Manadan subsequently offered an epidural steroid injection and trigger point injections which S.A. declined.

687. Manadan further recommended upper extremity electrodiagnostic studies, which he performed at that visit.

688. The medical records indicate that the electrodiagnostic studies showed bilateral C6 radiculitis as well as bilateral severe carpal tunnel syndrome and bilateral ulnar neuropathy.

689. Manadan indicated that he would consider epidural steroid injections at the left C6-7 level.

690. Notably, although Manadan had previously reported that S.A. had diminished pin prick sensation in the C8 dermatome, he did not indicate localized symptoms of C6 radiculopathy.

691. On January 23, 2024, Manadan reevaluated S.A. wherein he changed the subjective complaints to suggest that S.A. reported a decreased sensation on the "symptomatic side" in the C7 dermatome, with an additional diagnoses of cervical radiculopathy.

692. Although Manadan again offered an epidural steroid injection as well as trigger point injections, S.A. declined.

693. The medical records indicate that the patient was likely involved in a low speed motor vehicle accident, at which time she only complained of pain in her left hip.

694. The medical records indicate that S.A. did not complain of neck, back, and shoulder pain while in the ambulance or at the hospital, obviating the need for x-rays at that time.

695. The records therefore reflect that S.A. likely sustained only a contusion or mild strain to the left hip, which would be a self-limited soft tissue injury.

696. Such an injury would have recovered within days, as S.A. did not describe ongoing left hip concerns.

697. Any minor strain of the neck, back, or left shoulder would have been sufficiently minor that S.A. did not voice any complaints to the emergency personnel and did not require imaging at the hospital.

698. Although it is possible that S.A. sustained minor sprain or strains with a few days after the accident, the delayed minor sprains or strains would have been self-limited in nature and would have been expected to recover within four (4) to six (6) weeks.

699. S.A. would have been reasonably treated with a limited course of physical therapy <u>or</u> chiropractic treatment and medication for up to four (4) to six (6) weeks.

700. S.A. would not have required the extensive ongoing care of physical therapy, chiropractic treatment, and acupuncture.

701. Likewise, S.A. would not have required early pain management treatment and multiple MRI studies without a course of conservative care.

702. As such, the early MRI imaging and the persistent pain management care cannot be justified as medically necessary.

703. Such treatment is further medically unnecessary wherein the patient's reported radicular complaints and reported numbness do not correspond with the lateral electrodiagnostic findings of the localized neurocompressive findings on imaging.

704. In connection with the treatment purportedly rendered to the claimant, the Defendants submitted documentation to Allstate through the U.S. Mail and/or interstate wires, supporting their demand for No-Fault reimbursement in connection with the services purportedly provided to S.A.

705. The documentation submitted to Allstate by the Defendants demonstrates that S.A. was subjected to excessive and medically unnecessary healthcare services during the relevant period.

**viii. <u>Patient R.B. (Claim No. 0728662453)</u>**

706. Patient R.B. (Claim No. 0728662453) was purportedly involved in a motor vehicle accident on September 12, 2023.

707. As a result of the alleged motor vehicle accident, R.B. did not require immediate medical attention at the scene.

708. Rather, R.B. drove herself to City Medical of Upper East Side, PLLC where she was evaluated.

709. At the time of the evaluation, R.B. reportedly had complaints of neck pain radiating to both shoulders and upper back pain without extremity numbness or weakness.

710. R.B was not reported to have any distal radicular symptoms in the upper extremities, nor was she reported to have any lower back pain or radicular symptoms in the lower extremities.

711. The evaluation was notable for tenderness over the cervical paravertebral muscles and both trapezius muscles.

712. R.B. was further tender over the thoracic paraspinal muscles.

713. Both upper extremities had 5/5 motor strength and intact sensation, and there was no indication of an intrinsic shoulder injury to either injury.

714. R.B. was reported to have degenerative changes in the cervical and thoracic spine and was subsequently diagnosed with neck pain and thoracic back pain.

715. R.B. was not given a diagnoses of cervical radiculopathy nor was she given a diagnosis of an injury to the lower back pain or lumbar radiculopathy.

716. Accordingly, R.B. was prescribed a muscle relaxant and was referred for an orthopedic evaluation.

717. Notably, the radiographs for the 67-year-old patient were reported to show moderate to severe multilevel degenerative disc disease in the cervical spine.

718. On September 22, 2023, only ten (10) days after the motor vehicle accident, R.B. presented at Quantum PT.

719. R.B.'s course of physical therapy and chiropractic treatment at Quantum PT would subsequently span at least 62 visits through March 12, 2024.

720. On the same date, R.B. also initiated acupuncture treatment with Onepoint Acupuncture.

721. Similarly, R.B.'s course of acupuncture treatment spanned at least 50 visits through February 22, 2024.

722. Notably, the initial physical therapy record for September 22, 2023 notes that R.B. complained of neck and back pain and possible shoulder pain, although her pain was not described as radiating.

723. Neither the urgent care record on the date of the accident nor the initial physical therapy record suggested radicular complaints for R.B.

724. However, on September 26, 2023, R.B. sought additional medical treatment at New Millennium.

725. At that time, Javaid conducted an initial evaluation wherein he suggested that R.B. complained of neck pain radiating to both arms and low back pain radiating to both legs with numbness and tingling.

726. These complaints are inconsistent with the complaints noted in the urgent care records on the date of the loss and the physical therapy initial evaluation only four (4) days prior.

727. According to Javaid, R.B. reportedly complained of bilateral shoulder pain.

728. The examination reported to show decreased sensation in the C7 and L5 dermatomes.

729. The Spurling's test and straight leg raise test were reported to be positive bilaterally.

730. R.B. was given multiple diagnoses, including cervical disc disease, bilateral shoulder derangement, thoracic sprain/strain, thoracic disc disease, lumbar disc disease, lumbar facet arthropathy, lumbar sprain/strain, and myofascial pain.

731. In light of these findings, Javaid recommended that R.B. undergo a course of physical therapy and chiropractic treatment, and further indicated that MRI studies, electrodiagnostic studies, and injections would be considered.

732. Shortly thereafter, on October 6, 2023, R.B. underwent an impairment disability evaluation through RCK Medical.

733. At that time, R.B. was less than one (1) month removed from the motor vehicle accident.

734. The examiner suggested that R.B. had multiple working diagnoses, including possible disc injury in the cervical and lumbar spine, cervical and lumbar radiculopathy, sprains/strains of multiple areas, myofaciitis, myofascial pain syndrome, subluxation throughout the spine, possible injury to both shoulder joints, and sprains and strains of both shoulders.

735. As such, the examiner concluded that R.B. had a guarded prognosis with partial disability and recommended that she continue care with her treating provider.

736. Accordingly, on October 10, 2023, R.B. Returned to New Millennium where she was evaluated by Manadan.

737. At that time, R.B. was again reported to have neck pain and low back pain radiating to both arms and both legs with numbness and tingling.

738. Notably, Manadan noted the same exam findings as previously suggested by Javaid.

739. Although the examination was less than one (1) month after the motor vehicle accident, Manadan reiterated the multiple diagnoses noted in Javaid’s previous report and ordered multiple MRI studies, including the cervical spine, both shoulders, and lumbar spine.

740. Manadan further indicated that electrodiagnostic studies and injections would be considered, while recommending that R.B. continue the course of physical therapy and chiropractic treatment.

741. On October 31, 2023, R.B. underwent the multiple MRI studies, with the radiologist indicating that she had a "broad based" disc herniation at C4-5 and a "left paracentral" herniation at C5-6, as well as a right foraminal herniation at C6-7.

742. Disc bulging was also reported at C2-3, C3-4, C5-6, and C6-7.

743. The disc bulge at C6-7 was reported to be associated with the left and right foraminal herniations, with the patient noted to have impingement at multiple levels centrally and the bilateral foramen.

744. With regard to the lumbar spine, the radiologist indicated that the study showed multilevel disc herniations with a left foraminal herniation at L2-3, L3-4, and a broad based disc herniation at L4-5 and L5-S1.

745. Disc bulging was noted at multiple levels as well.

746. A grade I anterolisthesis was noted at the L4-5 level, with foraminal impingement reported at multiple levels.

747. The medical records indicate that R.B.'s left shoulder MRI was compared with a previous left shoulder MRI of September 11, 2008.

748. The MRI was reported to show interstitial tear of the supraspinatus in the presence of rotator cuff tendinosis.

749. The radiologist reported findings of a moderate joint effusion with synovitis and intraarticular bodies.

750. A type II slap tear was noted, with mild tenosynovitis at the long head of the biceps described.

751. Further, the coracohumeral ligament was reported to be thickened, which the radiologist suggested may be seen with adhesive capsulitis or “rotator interval injury”.

752. Acromioclavicular arthritic change was seen as well as downsloping of the acromion. Lastly, fluid within the subacromial bursal region was described as physiologic.

753. R.B. subsequently underwent an orthopedic evaluation through CitiMed Diagnostic on November 13, 2023, as a result of a referral from Birnhak.

754. The orthopedist noted that R.B. complained of left and right shoulder pain over the anterior and lateral acromial region down the deltoid but specifically denied any weakness, paresthesia, or numbness in the upper extremities.

755. This finding directly contradicts the reported complaints documented by Javaid and Manadan.

756. Moreover, distal neurovascular status was reported to be normal for both motor and sensory function, which again differs from the reported numbness suggested by Manadan and Javaid.

757. At the conclusion of the evaluation, R.B. was provided with an assessment of “bilateral shoulder symptomatic traumatic internal derangement resulting from a motor vehicle accident”.

758. The orthopedist recommended that R.B. continue physical therapy and further ordered a MRI of the right shoulder.

759. R.B. consequently returned to New Millennium on November 15, 2023 where monthly evaluations with Manadan and Javaid began.

760. At each visit, Manadan and Javaid continued to note that R.B. reported neck pain and low back pain radiating to both arms and both legs with numbness and tingling.

761. The radiating pain complaints and numbness and tingling, however, were not described at any particular nerve root pattern.

762. At each visit, Manadan and Javaid continued to provide multiple diagnoses and recommended further therapy and chiropractic treatment.

763. During the November 15, 2023 reevaluation, Manadan recommended and performed electrodiagnostic studies, which were reported to show slightly increased spontaneous activity in the right deltoid, left deltoid, and left pronator teres.

764. This study was reported to be consistent with bilateral C6 radiculitis and further showed bilateral carpal tunnel syndrome.

765. However, the C6 radiculitis would be inconsistent with the reported decreased sensation in the C7 dermatomes as previously noted by Manadan and Javaid.

766. In connection with the ongoing treatment, R.B. underwent a right shoulder MRI on November 24, 2023.

767. The radiologist indicated that the MRI showed glenohumeral arthritis with high grade cartilage loss, marrow edema, and osteophyte formation.

768. Also reported was tendinosis of the rotator cuff with high grade partial tearing of the supraspinatus tendon.

769. The MRI further showed labral tearing which was associated with glenohumeral arthritis, an arthritic change to the acromioclavicular joint, and mild tenosynovitis in the biceps.

770. R.B. was further caused to undergo a repeat impairment disability evaluation through RCK Medical on December 1, 2023.

771. Upper and lower sensory evaluations were subsequently reported to be normal, however R.B. was again referred for continued treatment with the treating provider, with an indication that further neurological and diagnostic testing may be ordered.

772. Notably, additional impairment disability evaluations were subsequently repeated on February 22, 2024 and March 21, 2024. R.B. ultimately continued the monthly reevaluations at New Millennium through March 12, 2024, with a cervical epidural steroid injection provided on January 30, 2024.

773. The patient's medical records indicate that R.B., who was 67-years-old at the time of the accident, likely sustained strains of the cervicothoracic spine and trapezius muscles.

774. These injuries would be consistent with the mechanism of injury described and the acute complaints noted in the urgent care records of September 12, 2023.

775. The strains of the cervicothoracic spine and trapezius muscles would be self-limited soft tissue injuries that would typically recover within approximately four (4) to six (6) weeks, with more severe strains or sprains resolving within approximately twelve (12) weeks.

776. It would have been appropriate for R.B. to be treated with a short course of physical therapy <u>or</u> chiropractic treatment and anti-inflammatory medication or a muscle relaxant.

777. In this case, the patient received an excessive amount of concomitant physical therapy and acupuncture treatment well beyond the time that any sprains or strains or soft tissue injuries would have recovered.

778. Likewise, the patient was placed on an excessive course of pain management treatment which was based on inconsistent and inaccurate findings, as well as MRI studies that were ordered prematurely and which did not factor in degenerative changes.

779. The multiple disability evaluations performed through RCK cannot be recommended as medically necessary and do not add to the care provided for this patient.

780. As such, the records indicate that R.B. was placed on a predetermined course of treatment that was medically unnecessary and excessive.

781. In connection with the treatment purportedly rendered to the claimant, the Defendants submitted documentation to Allstate through the U.S. Mail and/or interstate wires, supporting their demand for No-Fault reimbursement in connection with the services purportedly provided to R.B.

782. The documentation submitted to Allstate by the Defendants demonstrates that R.B. was subjected to excessive and medically unnecessary healthcare services during the relevant period.

## VI. SPECIFIC ALLEGATIONS OF MAIL FRAUD AND WIRE FRAUD RACKETEERING ACTIVITY

783. Throughout the course of this scheme, Birnhak, Castellano, Manadan, Chung, and Koffler, working through the PC Defendants, (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation, (b) intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and (c) placed, or caused to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud), for the purpose of executing, or attempting, such fraudulent schemes.

784. Throughout the course of this scheme, Birnhak, Castellano, Manadan, Chung, and Koffler, working through the PC Defendants, (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation, (b) intentionally violated the laws

of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and (c) transmitted, or caused to be transmitted, things to be sent and delivered by means of interstate wires, in violation of 18 U.S.C. § 1343 (wire fraud), for the purpose of executing, or attempting, such fraudulent schemes.

785. Unless otherwise pled to the contrary, all documents, treatment notes, testing reports, health insurance claim forms, NF-3 claim forms, narrative reports, referrals, prescriptions, letters, and requests for payments in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail and/or interstate wires.

786. Every automobile insurance claim detailed herein involved at least one use of the U.S. Mail and/or interstate wires, including the mailing or wiring of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks, and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as the return of settlement draft duplicates to the insurance carrier's home office for filing.

### A. QUANTUM PHYSICAL THERAPY & CHIROPRACTIC CARE, PLLC ENTERPRISE

787. Birnhak and Castellano (and/or other persons working at their discretion and/or on their behalf) either personally used the U.S. Mail and/or interstate wires (or caused the U.S. Mail and/or interstate wires to be used) to further this fraudulent scheme by causing medical bills and records from Quantum PT to be mailed and/or wired to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail and/or interstate wires would follow in the ordinary course of business.

788. Birnhak and Castellano (and/or other persons working at their direction and/or on their behalf), caused Quantum PT to falsely certify that it was, in all respects, eligible to be

reimbursed under New York's No-Fault Laws each time that Quantum PT mailed and/or wired a demand for payment (i.e., invoice) to Allstate.

789. Persons acting under Birnhak and Castellano's direction and control provided excessive and medically unnecessary physical therapy and chiropractic treatment to patients of Quantum PT, which rendered Quantum PT completely ineligible for No-Fault reimbursement under New York law.

790. Because Quantum PT was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Birnhak and Castellano purposely caused Quantum PT to make a misrepresentation each and every time that Quantum PT mailed and/or wired a document to Allstate claiming eligibility for No-Fault reimbursement.

791. Birnhak and Castellano committed mail fraud and/or wire fraud through the Quantum PT enterprise because (a) Quantum PT was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Quantum PT was caused to seek No-Fault reimbursement from Allstate even though Quantum PT was not entitled to such reimbursement, and (c) Quantum PT used (or was caused to use) the U.S. Mail and/or interstate wires to seek No-Fault reimbursement.

792. At all relevant times, Birnhak and Castellano knew that Quantum PT (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail and/or interstate wires in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed and/or wired by Quantum PT.

793. Allstate estimates that the unlawful operation of the Quantum PT enterprise generated hundreds of mailings and/or wires. A table highlighting selected examples of mailings

and wires made in furtherance of this scheme is annexed at Exhibit 1 and incorporated by reference as if set forth in its entirety.

## B. New Millennium Pain & Spine Medicine, PLLC Enterprise

794. Birnhak, Castellano, and Manadan (and/or other persons working at their discretion and/or on their behalf) either personally used the U.S. Mail and/or interstate wires (or caused the U.S. Mail and/or interstate wires to be used) to further this fraudulent scheme by causing medical bills and records from New Millennium to be mailed and/or wired to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail and/or interstate wires would follow in the ordinary course of business.

795. Birnhak, Castellano, and Manadan (and/or other persons working at their direction and/or on their behalf), caused New Millennium to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that New Millennium mailed and/or wired a demand for payment (i.e., invoice) to Allstate.

796. Persons acting under Birnhak, Castellano, and Manadan's direction and control provided excessive and medically unnecessary healthcare services to patients of New Millennium, which rendered New Millennium completely ineligible for No-Fault reimbursement under New York law.

797. Because New Millennium was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Birnhak, Castellano, and Manadan purposely caused New Millennium to make a misrepresentation each and every time that New Millennium mailed and/or wired a document to Allstate claiming eligibility for No-Fault reimbursement.

798. Birnhak, Castellano, and Manadan committed mail fraud and/or wire fraud through the New Millennium enterprise because (a) New Millennium was not lawfully eligible to seek or

collect No-Fault benefit payments, (b) New Millennium was caused to seek No-Fault reimbursement from Allstate even though New Millennium was not entitled to such reimbursement, and (c) New Millennium used (or was caused to use) the U.S. Mail and/or interstate wires to seek No-Fault reimbursement.

799. At all relevant times, Birnhak, Castellano, and Manadan knew that New Millennium (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail and/or interstate wires in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed and/or wired by New Millennium.

800. Allstate estimates that the unlawful operation of the New Millennium enterprise generated hundreds of mailings and/or wires. A table highlighting selected examples of mailings and wires made in furtherance of this scheme is annexed at Exhibit 2 and incorporated by reference as if set forth in its entirety.

### C. CAREPOINT ACUPUNCTURE, P.C. ENTERPRISE

801. Birnhak, Castellano, and Chung (and/or other persons working at their discretion and/or on their behalf) either personally used the U.S. Mail and/or interstate wires (or caused the U.S. Mail and/or interstate wires to be used) to further this fraudulent scheme by causing medical bills and records from Carepoint Acupuncture to be mailed and/or wired to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail and/or interstate wires would follow in the ordinary course of business.

802. Birnhak, Castellano, and Chung (and/or other persons working at their direction and/or on their behalf), caused Carepoint Acupuncture to falsely certify that it was, in all respects,

eligible to be reimbursed under New York's No-Fault Laws each time that Carepoint Acupuncture mailed and/or wired a demand for payment (i.e., invoice) to Allstate.

803. Persons acting under Birnhak, Castellano, and Chung's direction and control provided excessive and medically unnecessary acupuncture treatment to patients of Carepoint Acupuncture, which rendered Carepoint Acupuncture completely ineligible for No-Fault reimbursement under New York law.

804. Because Carepoint Acupuncture was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Birnhak, Castellano, and Chung purposely caused Carepoint Acupuncture to make a misrepresentation each and every time that Carepoint Acupuncture mailed and/or wired a document to Allstate claiming eligibility for No-Fault reimbursement.

805. Birnhak, Castellano, and Chung committed mail fraud and/or wire fraud through the Carepoint Acupuncture enterprise because (a) Carepoint Acupuncture was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Carepoint Acupuncture was caused to seek No-Fault reimbursement from Allstate even though Carepoint Acupuncture was not entitled to such reimbursement, and (c) Carepoint Acupuncture used (or was caused to use) the U.S. Mail and/or interstate wires to seek No-Fault reimbursement.

806. At all relevant times, Birnhak, Castellano, and Chung knew that Carepoint Acupuncture (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail and/or interstate wires in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed and/or wired by Carepoint Acupuncture.

807. Allstate estimates that the unlawful operation of the Carepoint Acupuncture enterprise generated hundreds of mailings and/or wires. A table highlighting selected examples of mailings and wires made in furtherance of this scheme is annexed at Exhibit 3 and incorporated by reference as if set forth in its entirety.

### D. ONEPOINT ACUPUNCTURE, P.C. ENTERPRISE

808. Birnhak, Castellano, and Chung (and/or other persons working at their discretion and/or on their behalf) either personally used the U.S. Mail and/or interstate wires (or caused the U.S. Mail and/or interstate wires to be used) to further this fraudulent scheme by causing medical bills and records from Onepoint Acupuncture to be mailed and/or wired to Allstate and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail and/or interstate wires would follow in the ordinary course of business.

809. Birnhak, Castellano, and Chung (and/or other persons working at their direction and/or on their behalf), caused Onepoint Acupuncture to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Onepoint Acupuncture mailed and/or wired a demand for payment (i.e., invoice) to Allstate.

810. Persons acting under Birnhak, Castellano, and Chung's direction and control provided excessive and medically unnecessary acupuncture treatment to patients of Onepoint Acupuncture, which rendered Onepoint Acupuncture completely ineligible for No-Fault reimbursement under New York law.

811. Because Onepoint Acupuncture was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Birnhak, Castellano, and Chung purposely caused Onepoint Acupuncture to make a misrepresentation each and every time that

Onepoint Acupuncture mailed and/or wired a document to Allstate claiming eligibility for No-Fault reimbursement.

812. Birnhak, Castellano, and Chung committed mail fraud and/or wire fraud through the Onepoint Acupuncture enterprise because (a) Onepoint Acupuncture was not lawfully eligible to seek or collect No-Fault benefit payments, (b) Onepoint Acupuncture was caused to seek No-Fault reimbursement from Allstate even though Onepoint Acupuncture was not entitled to such reimbursement, and (c) Onepoint Acupuncture used (or was caused to use) the U.S. Mail and/or interstate wires to seek No-Fault reimbursement.

813. At all relevant times, Birnhak, Castellano, and Chung knew that Onepoint Acupuncture (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to use) the U.S. Mail and/or interstate wires in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed and/or wired by Onepoint Acupuncture

814. Allstate estimates that the unlawful operation of the Onepoint Acupuncture enterprise generated hundreds of mailings and/or wires. A table highlighting selected examples of mailings and wires made in furtherance of this scheme is annexed at Exhibit 4 and incorporated by reference as if set forth in its entirety.

## E. RCK MEDICAL SERVICES, P.C. ENTERPRISE

815. Birnhak, Castellano, and Koffler (and/or other persons working at their discretion and/or on their behalf) either personally used the U.S. Mail and/or interstate wires (or caused the U.S. Mail and/or interstate wires to be used) to further this fraudulent scheme by causing medical bills and records from RCK Medical to be mailed and/or wired to Allstate and/or counsel for

patients, and/or acted with knowledge that the use of the U.S. Mail and/or interstate wires would follow in the ordinary course of business.

816. Birnhak, Castellano, and Koffler (and/or other persons working at their direction and/or on their behalf), caused RCK Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that RCK Medical mailed and/or wired a demand for payment (i.e., invoice) to Allstate.

817. Persons acting under Birnhak, Castellano, and Koffler's direction and control provided excessive and medically unnecessary healthcare services to patients of RCK Medical, which rendered RCK Medical completely ineligible for No-Fault reimbursement under New York law.

818. Because RCK Medical was not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, Birnhak, Castellano, and Koffler purposely caused RCK Medical to make a misrepresentation each and every time that RCK Medical mailed and/or wired a document to Allstate claiming eligibility for No-Fault reimbursement.

819. Birnhak, Castellano, and Koffler committed mail fraud and/or wire fraud through the RCK Medical enterprise because (a) RCK Medical was not lawfully eligible to seek or collect No-Fault benefit payments, (b) RCK Medical was caused to seek No-Fault reimbursement from Allstate even though RCK Medical was not entitled to such reimbursement, and (c) RCK Medical used (or was caused to use) the U.S. Mail and/or interstate wires to seek No-Fault reimbursement.

820. At all relevant times, Birnhak, Castellano, and Koffler knew that RCK Medical (including its employees, owner(s), contractors, and agents), a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, and/or Allstate would use (or be caused to

use) the U.S. Mail and/or interstate wires in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed and/or wired by RCK Medical.

821. Allstate estimates that the unlawful operation of the RCK Medical enterprise generated hundreds of mailings and/or wires. A table highlighting selected examples of mailings and wires made in furtherance of this scheme is annexed at Exhibit 5 and incorporated by reference as if set forth in its entirety.

## VII. SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MATERIAL MISREPRESENTATIONS MADE TO AND RELIED UPON BY ALLSTATE

### A. FRAUDULENT CONCEALMENT – QUANTUM PHYSICAL THERAPY & CHIROPRACTIC CARE, PLLC ENTERPRISE

822. At all relevant times during the operation of the Quantum PT enterprise, Birnhak, and Castellano caused Quantum PT to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary physical therapy and chiropractic treatment purportedly provided to Allstate Claimants.

823. Birnhak, and Castellano (along with those individuals working under their control) purposely concealed the lack of medical necessity for the physical therapy and chiropractic treatment purportedly provided and charged for by Quantum PT.

824. Birnhak, and Castellano (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the physical therapy and chiropractic treatment purportedly provided by Quantum PT to Allstate Claimants.

825. Because Birnhak, and Castellano were responsible for (a) directing the excessive and medically unnecessary physical therapy and chiropractic treatment purportedly rendered to

Allstate Claimants, (b) creating and/or fabricating treatment records submitted to Allstate in support of physical therapy and chiropractic treatment purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary physical therapy and chiropractic treatments purportedly rendered to Allstate Claimants through Quantum PT, (d) falsely charging for the physical therapy and chiropractic treatment with the knowledge that these treatments were not lawfully reimbursable under New York's No-Fault laws, Quantum PT was caused to falsely claim eligibility each and every time that Quantum PT sought No-Fault reimbursement from Allstate.

826. As alleged above, Birnhak, and Castellano (or those persons working under their control) caused Quantum PT to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to physical therapy and chiropractic treatment that were (a) unlawful, (b) unnecessary, and/or (c) excessive.

827. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

828. Many of the false, fraudulent, and unlawful acts are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

829. Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

830. Thus, every time that Birnhak, and Castellano (along with those individuals working under their control) caused Quantum PT to submit No-Fault reimbursement demands to

Allstate, Birnhak, and Castellano (and those individuals working under their control) necessarily certified that Quantum PT was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

831. The full extent of Birnhak, and Castellano's fraudulent and unlawful acts relative to their participation in the Quantum PT enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### B. FRAUDULENT CONCEALMENT – NEW MILLENNIUM PAIN & SPINE MEDICINE, PLLC ENTERPRISE

832. At all relevant times during the operation of the New Millennium enterprise, Birnhak, Castellano, and Manadan purposely caused New Millennium to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary healthcare services purportedly provided to Allstate Claimants.

833. Birnhak, Castellano, and Manadan (along with those individuals working under their control) purposely concealed the lack of medical necessity for the healthcare services purportedly provided and charged for by New Millennium.

834. Birnhak, Castellano, and Manadan (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the healthcare services purportedly provided by New Millennium to Allstate Claimants.

835. Because Birnhak, Castellano, and Manadan were responsible for (a) directing the excessive and medically unnecessary physical therapy and chiropractic treatment purportedly rendered to Allstate Claimants, (b) creating and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for

excessive and medically unnecessary pain management services purportedly rendered to Allstate Claimants through the New Millennium, (d) falsely charging for the pain management services with the knowledge that these pain management services were not lawfully reimbursable under New York's No-Fault laws, and (e) billing Allstate for pain management services that were, in certain instances, not rendered as billed, New Millennium was caused to falsely claim eligibility each and every time that New Millennium sought No-Fault reimbursement from Allstate.

836. As alleged above, Birnhak, Castellano, and Manadan (or those persons working under their control) caused New Millennium to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to healthcare services that were (a) unlawful, (b) unnecessary, (c) excessive, and/or (d) not rendered as billed.

837. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

838. Many of the false, fraudulent, and unlawful acts are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

839. Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

840. Thus, every time that Birnhak, Castellano, and Manadan (along with those individuals working under their control) caused New Millennium to submit No-Fault reimbursement demands to Allstate, Birnhak, Castellano, and Manadan (and those individuals

working under their control) necessarily certified that New Millennium was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

841. The full extent of Birnhak, Castellano, and Manadan's fraudulent and unlawful acts relative to their participation in the New Millennium enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### C. Fraudulent Concealment – Carepoint Acupuncture, P.C. Enterprise

842. At all relevant times during the operation of the Carepoint Acupuncture enterprise, Birnhak, Castellano, and Chung purposely caused Carepoint Acupuncture to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary acupuncture treatment purportedly provided to Allstate Claimants.

843. Birnhak, Castellano, and Chung (along with those individuals working under their control) purposely concealed the lack of medical necessity for the acupuncture treatment purportedly provided and charged for by Carepoint Acupuncture.

844. Birnhak, Castellano, and Chung (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the acupuncture treatment purportedly provided by Carepoint Acupuncture to Allstate Claimants.

845. Because Birnhak, Castellano, and Chung were responsible for (a) directing the excessive and medically unnecessary acupuncture treatment purportedly rendered to Allstate Claimants, (b) creating and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary acupuncture treatment purportedly rendered to Allstate Claimants through

Carepoint Acupuncture, and (d) falsely charging for the healthcare services with the knowledge that these healthcare services were not lawfully reimbursable under New York's No-Fault laws, Carepoint Acupuncture was caused to falsely claim eligibility each and every time that Carepoint Acupuncture sought No-Fault reimbursement from Allstate.

846. As alleged above, Birnhak, Castellano, and Chung (or those persons working under their control) caused Carepoint Acupuncture to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to healthcare services that were (a) unlawful, (b) unnecessary, and/or (c) excessive.

847. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

848. Many of the false, fraudulent, and unlawful acts are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

849. Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

850. Thus, every time that Birnhak, Castellano, and Chung (along with those individuals working under their control) caused Carepoint Acupuncture to submit No-Fault reimbursement demands to Allstate, Birnhak, Castellano, and Chung (and those individuals working under their control) necessarily certified that Carepoint Acupuncture was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

851. The full extent of Birnhak, Castellano, and Chung's fraudulent and unlawful acts relative to their participation in the Carepoint Acupuncture enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

### D. FRAUDULENT CONCEALMENT – ONEPOINT ACUPUNCTURE, P.C. ENTERPRISE

852. At all relevant times during the operation of the Onepoint Acupuncture enterprise, Birnhak, Castellano, and Chung purposely caused Onepoint Acupuncture to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary acupuncture treatment purportedly provided to Allstate Claimants.

853. Birnhak, Castellano, and Chung (along with those individuals working under their control) purposely concealed the lack of medical necessity for the acupuncture treatment purportedly provided and charged for by Onepoint Acupuncture.

854. Birnhak, Castellano, and Chung (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the acupuncture treatment purportedly provided by Onepoint Acupuncture to Allstate Claimants.

855. Because Birnhak, Castellano, and Chung were responsible for (a) directing the excessive and medically unnecessary acupuncture treatment purportedly rendered to Allstate Claimants, (b) creating and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary acupuncture treatment purportedly rendered to Allstate Claimants through Onepoint Acupuncture, and (d) falsely charging for the healthcare services with the knowledge that these healthcare services were not lawfully reimbursable under New York's No-Fault laws,

Onepoint Acupuncture was caused to falsely claim eligibility each and every time that Onepoint Acupuncture sought No-Fault reimbursement from Allstate.

856. As alleged above, Birnhak, Castellano, and Chung (or those persons working under their control) caused Onepoint Acupuncture to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to healthcare services that were (a) unlawful, (b) unnecessary, and/or (c) excessive.

857. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

858. Many of the false, fraudulent, and unlawful acts are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

859. Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

860. Thus, every time that Birnhak, Castellano, and Chung (along with those individuals working under their control) caused Onepoint Acupuncture to submit No-Fault reimbursement demands to Allstate, Birnhak, Castellano, and Chung (and those individuals working under their control) necessarily certified that Onepoint Acupuncture was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

861. The full extent of Birnhak, Castellano, and Chung's fraudulent and unlawful acts relative to their participation in the Onepoint Acupuncture enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

## E. FRAUDULENT CONCEALMENT – RCK MEDICAL SERVICES, P.C. ENTERPRISE

862. At all relevant times during the operation of the RCK Medical enterprise, Birnhak, Castellano, and Koffler purposely caused RCK Medical to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws as a means to induce Allstate to promptly pay charges related to excessive and medically unnecessary healthcare services purportedly provided to Allstate Claimants.

863. Birnhak, Castellano, and Koffler (along with those individuals working under their control) purposely concealed the lack of medical necessity for the healthcare services purportedly provided and charged for by RCK Medical.

864. Birnhak, Castellano, and Koffler (or those working under their direction and control) created and submitted to Allstate (or caused the creation and submission of) treatment records that falsely purported to justify the necessity of the healthcare services purportedly provided by RCK Medical to Allstate Claimants.

865. Because Birnhak, Castellano, and Koffler were responsible for (a) directing the excessive and medically unnecessary healthcare services purportedly rendered to Allstate Claimants, (b) creating and/or fabricating treatment records submitted to Allstate in support of services purportedly rendered to Allstate Claimants, (c) billing Allstate for excessive and medically unnecessary healthcare services purportedly rendered to Allstate Claimants through RCK Medical, (d) falsely charging for the healthcare services with the knowledge that these healthcare services were not lawfully reimbursable under New York's No-Fault laws, and (e) billing Allstate for healthcare services that were, in certain instances, not rendered as billed, RCK Medical was caused to falsely claim eligibility each and every time that RCK Medical sought No-Fault reimbursement from Allstate.

866. As alleged above, Birnhak, Castellano, and Koffler (or those persons working under their control) caused RCK Medical to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to healthcare services that were (a) unlawful, (b) unnecessary, (c) excessive, and/or (d) not rendered as billed.

867. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

868. Many of the false, fraudulent, and unlawful acts are not readily evident within the four corners of the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

869. Claims under New York's No-Fault laws can only be submitted, and reimbursed, for healthcare services provided or administered in accordance with all applicable New York state licensing requirements.

870. Thus, every time that Birnhak, Castellano, and Koffler (along with those individuals working under their control) caused RCK Medical to submit No-Fault reimbursement demands to Allstate, Birnhak, Castellano, and Koffler (and those individuals working under their control) necessarily certified that RCK Medical was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

871. The full extent of Birnhak, Castellano, and Koffler's fraudulent and unlawful acts relative to their participation in the RCK Medical enterprise was not, and could not have been, known to Allstate until shortly before it commenced this action.

## VIII. ALLSTATE'S JUSTIFIABLE RELIANCE

872. Each claim submitted to Allstate by (or on behalf of) the PC Defendants was verified pursuant to Insurance Law § 403.

873. At all relevant times, Birnhak, Castellano, Manadan, Chung, and Koffler, as licensed healthcare providers, were legally and ethically obligated to act with honesty and integrity in connection with their provision of, and billing for, healthcare services.

874. To induce Allstate to promptly pay the PC Defendants' invoices, the defendants submitted (or caused to be submitted) to Allstate NF-3 forms or CMS-1500 forms certifying that the PC Defendants were eligible to be reimbursed under New York's No-Fault laws.

875. Further, to induce Allstate to promptly pay the non-compensable charges for the professional healthcare services purportedly provided to patients of the PC Defendants, the defendants hired attorneys and law firms to pursue collection of the fraudulent and/or otherwise non-compensable charges from Allstate.

876. These attorneys and law firms routinely file time-consuming and expensive lawsuits and arbitration matters against Allstate in the event that the PC Defendants' invoices are not promptly paid in full.

877. Allstate is under a statutory and contractual obligation to promptly and fairly process claims within thirty (30) days.

878. The facially valid documents submitted to Allstate in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

879. At all relevant times, as alleged above, the defendants concealed from Allstate the truth regarding the PC Defendants' reimbursement eligibility under New York law.

880. Acting in reasonable reliance on these misrepresentations, Allstate paid money to the PC Defendants to its detriment.

881. Allstate would not have made any of these payments to these entities had the Defendants provided true and accurate information about the PC Defendants' reimbursement eligibility under New York law, including the operation of these entities and the fact and necessity of the services provided.

882. As a result of the Defendants' conduct, Allstate has been forced to make substantial payments in reasonable reliance on the Defendants' false healthcare documentation and false representations regarding the Defendants' eligibility for reimbursement under New York's No-Fault laws.

883. Because the Defendants actively concealed their fraudulent conduct from Allstate, Allstate did not discover, and could not have reasonably discovered, that it had been damaged by the Defendants' fraudulent conduct until shortly before it filed this Complaint.

## IX. **DAMAGES**

884. The Defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Allstate to calculate its damages with specificity at this stage of the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments wrongfully made to the PC Defendants in connection with claims made under New York's No-Fault Laws, the exact amount to be determined at trial, including:

(a) Payments made to Quantum Physical Therapy & Chiropractic Care, PLLC totaling at least $1,401,990.45, the exact amount to be determined at trial. The chart at Exhibit 6 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Quantum Physical Therapy & Chiropractic Care, PLLC in connection with first-party

("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(b) Payments made to New Millennium Pain & Spine Medicine, PLLC totaling at least $1,020,797.40, the exact amount to be determined at trial. The chart at Exhibit 7 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to New Millennium Pain & Spine Medicine, PLLC in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(c) Payments made to Carepoint Acupuncture, P.C. totaling at least $196,197.76, the exact amount to be determined at trial. The chart at Exhibit 8 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Carepoint Acupuncture, P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(d) Payments made to Onepoint Acupuncture, P.C. totaling at least $706,776.97, the exact amount to be determined at trial. The chart at Exhibit 9 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Onepoint Acupuncture, P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

(e) Payments made to RCK Medical Services, P.C. totaling at least $453,071.34, the exact amount to be determined at trial. The chart at Exhibit 10 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to RCK Medical Services, P.C. in connection with first-party ("No-Fault") claims determined to be false, fraudulent, and not compensable as of the filing of this Complaint.

## X. CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### QUANTUM PHYSICAL THERAPY & CHIROPRACTIC CARE, PLLC ENTERPRISE
### (Against Jason Birnhak, D.C. and Johanna Castellano, P.T.)

885. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-884 as if set forth fully herein.

886. Quantum Physical Therapy & Chiropractic Care, PLLC ("Quantum PT") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

887. In connection with the operation and management of the Quantum PT enterprise and with each of the claims identified in the plaintiffs' Complaint, Jason Birnhak, D.C. and Johanna Castellano, P.T. (collectively, the "Count I Defendants") intentionally caused to be prepared and mailed and/or wired false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed and/or wired in the ordinary course of Quantum PT's business, or should have reasonably foreseen that the mailing and/or wiring of such false medical documentation by Quantum PT would occur, in furtherance of their scheme to defraud.

888. The Count I Defendants employed, knew, or should have foreseen two (2) or more mailings and/or wires to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 1.

889. Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail and/or interstate wires.

890. Policies of insurance were also delivered to insureds through the U.S. Mail and/or interstate wires.

891. Payments made by Allstate to Quantum PT traveled through the U.S. Mail and/or interstate wires.

892. As documented above, the Count I Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Quantum PT—payments that the Count I Defendants intended to be funded using the No-Fault insurance benefits

that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

893. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Quantum PT for the benefit of the Count I Defendants that would not otherwise have been made.

894. The Count I Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count I Defendants to continue this unlawful scheme without being detected.

895. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

896. By mailing and/or wiring numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

897. The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Quantum PT for the benefit of the Count I Defendants.

898. The Count I Defendants participated in the conduct of the Quantum PT enterprise through a pattern of racketeering activities.

899. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

900. The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

901. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

902. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

903. By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by the Count I Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**QUANTUM PHYSICAL THERAPY & CHIROPRACTIC CARE, PLLC ENTERPRISE**
**(Against Jason Birnhak, D.C. and Johanna Castellano, P.T.)**

904. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-884 as if set forth fully herein.

905. Defendants Jason Birnhak, D.C. and Johanna Castellano, P.T. (collectively, the "Count II Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Quantum Physical Therapy & Chiropractic Care, PLLC ("Quantum PT").

906. The Count II Defendants each agreed to further, facilitate, support, and operate the Quantum PT enterprise.

907. As such, the Count II Defendants conspired to violate 18 U.S.C. § 1962(c).

908. The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Quantum PT even though Quantum PT was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count II Defendants.

909. The Count II Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

910. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Quantum PT as a result of the Count II Defendants' unlawful conduct described herein.

911. By virtue of the Count II Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the Defendants identified, three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## NEW MILENNIUM PAIN AND SPINE MEDICINE, PLLC ENTERPRISE
## (Against Paul Manadan, M.D., Jason Birnhak, D.C., and Johanna Castellano, P.T.)

912. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-884 as if set forth fully herein.

913. New Millennium Pain and Spine Medicine, PLLC ("New Millennium") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

914. In connection with the operation and management of the New Millennium enterprise and with each of the claims identified in the plaintiffs' Complaint, Paul Manadan, M.D., Jason Birnhak, D.C., and Johanna Castellano, P.T. (collectively, the "Count III Defendants") intentionally caused to be prepared and mailed and/or wired false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed and/or wired in the ordinary course of New Millennium's business, or should have

reasonably foreseen that the mailing and/or wiring of such false medical documentation by New Millennium would occur, in furtherance of their scheme to defraud.

915. The Count III Defendants employed, knew, or should have foreseen two (2) or more mailings and/or wires to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 2.

916. Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail and/or interstate wires.

917. Policies of insurance were also delivered to insureds through the U.S. Mail and/or interstate wires.

918. Payments made by Allstate to New Millennium traveled through the U.S. Mail and/or interstate wires.

919. As documented above, the Count III Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through New Millennium —payments that the Count III Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

920. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to New Millennium for the benefit of the Count III Defendants that would not otherwise have been made.

921. The Count III Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long

period of time, thus enabling the Count III Defendants to continue this unlawful scheme without being detected.

922. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

923. By mailing and/or wiring numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

924. The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to New Millennium for the benefit of the Count III Defendants.

925. The Count III Defendants participated in the conduct of the New Millennium enterprise through a pattern of racketeering activities.

926. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

927. The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

928. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

929. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

930. By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims

submitted by the Count III Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## <u>COUNT IV</u><br>VIOLATIONS OF 18 U.S.C. § 1962(d)<br>NEW MILENNIUM PAIN AND SPINE MEDICINE, PLLC ENTERPRISE<br>(Against Paul Manadan, M.D., Jason Birnhak, D.C., and Johanna Castellano, P.T.)

931. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-884 as if set forth fully herein.

932. Defendants Paul Manadan, M.D., Jason Birnhak, D.C., and Johanna Castellano, P.T. (collectively, the "Count IV Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of New Millennium Pain and Spine Medicine, PLLC ("New Millennium").

933. The Count IV Defendants each agreed to further, facilitate, support, and operate the New Millennium enterprise.

934. As such, the Count IV Defendants conspired to violate 18 U.S.C. § 1962(c).

935. The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through New Millennium even though New Millennium was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count IV Defendants.

936. The Count IV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

937. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the

benefit of) New Millennium as a result of the Count IV Defendants' unlawful conduct described herein.

938. By virtue of the Count IV Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the Defendants identified, three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT V**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**CAREPOINT ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Hye Hyun Chung, L.Ac., Jason Birnhak, D.C., and Johanna Castellano, P.T.)**

939. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-884 as if set forth fully herein.

940. Carepoint Acupuncture, P.C. ("Carepoint Acupuncture") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

941. In connection with the operation and management of the Carepoint Acupuncture enterprise and with each of the claims identified in the plaintiffs' Complaint, Hye Hyun Chung, L.Ac., Jason Birnhak, D.C., and Johanna Castellano, P.T. (collectively, the "Count V Defendants") intentionally caused to be prepared and mailed and/or wired false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed and/or wired in the ordinary course of Carepoint Acupuncture's business, or should have reasonably foreseen that the mailing and/or wiring of such false medical documentation by Carepoint Acupuncture would occur, in furtherance of their scheme to defraud.

942. The Count V Defendants employed, knew, or should have foreseen two (2) or more mailings and/or wires to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 3.

943. Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail and/or interstate wires.

944. Policies of insurance were also delivered to insureds through the U.S. Mail and/or interstate wires.

945. Payments made by Allstate to Carepoint Acupuncture traveled through the U.S. Mail and/or interstate wires.

946. As documented above, the Count V Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Carepoint Acupuncture—payments that the Count V Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

947. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Carepoint Acupuncture for the benefit of the Count V Defendants that would not otherwise have been made.

948. The Count V Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count V Defendants to continue this unlawful scheme without being detected.

949. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

950. By mailing and/or wiring numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

951. The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Carepoint Acupuncture for the benefit of the Count V Defendants.

952. The Count V Defendants participated in the conduct of the Carepoint Acupuncture enterprise through a pattern of racketeering activities.

953. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V Defendants' conduct.

954. The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

955. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

956. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

957. By virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by the Count V Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VI
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## CAREPOINT ACUPUNCTURE, P.C. ENTERPRISE
## (Against Hye Hyun Chung, L.Ac., Jason Birnhak, D.C., and Johanna Castellano, P.T.)

958. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-884 as if set forth fully herein.

959. Defendants Hye Hyun Chung, L.Ac., Jason Birnhak, D.C., and Johanna Castellano, P.T. (collectively, the "Count VI Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Carepoint Acupuncture, P.C. ("Carepoint Acupuncture").

960. The Count VI Defendants each agreed to further, facilitate, support, and operate the Carepoint Acupuncture enterprise.

961. As such, the Count VI Defendants conspired to violate 18 U.S.C. § 1962(c).

962. The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Carepoint Acupuncture even though Carepoint Acupuncture was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count VI Defendants.

963. The Count VI Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

964. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Carepoint Acupuncture as a result of the Count VI Defendants' unlawful conduct described herein.

965. By virtue of the Count VI Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the Defendants identified, three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ONEPOINT ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Hye Hyun Chung, L.Ac., Jason Birnhak, D.C., and Johanna Castellano, P.T.)**

966. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-884 as if set forth fully herein.

967. Onepoint Acupuncture, P.C. ("Onepoint Acupuncture") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

968. In connection with the operation and management of the Onepoint Acupuncture enterprise and with each of the claims identified in the plaintiffs' Complaint, Hye Hyun Chung, L.Ac., Jason Birnhak, D.C., and Johanna Castellano, P.T. (collectively, the "Count VII Defendants") intentionally caused to be prepared and mailed and/or wired false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed and/or wired in the ordinary course of Onepoint Acupuncture's business, or should have reasonably foreseen that the mailing and/or wiring of such false medical documentation by Onepoint Acupuncture would occur, in furtherance of their scheme to defraud.

969. The Count VII Defendants employed, knew, or should have foreseen two (2) or more mailings and/or wires to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 4.

970. Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail and/or interstate wires.

971. Policies of insurance were also delivered to insureds through the U.S. Mail and/or interstate wires.

972. Payments made by Allstate to Onepoint Acupuncture traveled through the U.S. Mail and/or interstate wires.

973. As documented above, the Count VII Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through Onepoint Acupuncture—payments that the Count VII Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

974. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to Onepoint Acupuncture for the benefit of the Count VII Defendants that would not otherwise have been made.

975. The Count VII Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count VII Defendants to continue this unlawful scheme without being detected.

976. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

977. By mailing and/or wiring numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count VII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

978. The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Onepoint Acupuncture for the benefit of the Count VII Defendants.

979. The Count VII Defendants participated in the conduct of the Onepoint Acupuncture enterprise through a pattern of racketeering activities.

980. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII Defendants' conduct.

981. The Count VII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

982. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

983. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

984. By virtue of the Count VII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by the Count VII Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**<u>COUNT VIII</u>**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**ONEPOINT ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Hye Hyun Chung, L.Ac., Jason Birnhak, D.C., and Johanna Castellano, P.T.)**

985. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-884 as if set forth fully herein.

986. Defendants Hye Hyun Chung, L.Ac., Jason Birnhak, D.C., and Johanna Castellano, P.T. (collectively, the "Count VIII Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of Onepoint Acupuncture, P.C. ("Onepoint Acupuncture").

987. The Count VIII Defendants each agreed to further, facilitate, support, and operate the Onepoint Acupuncture enterprise.

988. As such, the Count VIII Defendants conspired to violate 18 U.S.C. § 1962(c).

989. The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through Onepoint Acupuncture even though Onepoint Acupuncture was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count VIII Defendants.

990. The Count VIII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

991. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) Onepoint Acupuncture as a result of the Count VIII Defendants' unlawful conduct described herein.

992. By virtue of the Count VIII Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the Defendants identified, three times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT IX**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**RCK MEDICAL SERVICES, P.C. ENTERPRISE**
**(Against Richard Koffler, M.D., Jason Birnhak, D.C., and Johanna Castellano, P.T.)**

993. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-884 as if set forth fully herein.

994. RCK Medical Services, P.C. ("RCK Medical") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

995. In connection with the operation and management of the RCK Medical enterprise and with each of the claims identified in the plaintiffs' Complaint, Richard Koffler, M.D., Jason Birnhak, D.C., and Johanna Castellano, P.T. (collectively, the "Count IX Defendants") intentionally caused to be prepared and mailed and/or wired false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed and/or wired in the ordinary course of RCK Medical's business, or should have reasonably foreseen that the mailing and/or wiring of such false medical documentation by RCK Medical would occur, in furtherance of their scheme to defraud.

996. The Count IX Defendants employed, knew, or should have foreseen two (2) or more mailings and/or wires to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart as Exhibit 5.

997. Among other things, NF-3 forms, CMS-1500 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail and/or interstate wires.

998. Policies of insurance were also delivered to insureds through the U.S. Mail and/or interstate wires.

999. Payments made by Allstate to RCK Medical traveled through the U.S. Mail and/or interstate wires.

1000. As documented above, the Count IX Defendants repeatedly and intentionally submitted NF-3 forms, CMS-1500 forms, and other medical documentation to Allstate for the purpose of seeking payment for healthcare services provided to patients through RCK Medical — payments that the Count IX Defendants intended to be funded using the No-Fault insurance benefits that were provided under the applicable Allstate automobile insurance policy pursuant to New York law.

1001. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued payments to RCK Medical for the benefit of the Count IX Defendants that would not otherwise have been made.

1002. The Count IX Defendants' pattern of fraudulent claims, each of which appeared legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count IX Defendants to continue this unlawful scheme without being detected.

1003. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

1004. By mailing and/or wiring numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count IX Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1005. The unlawful activities and other misconduct alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to RCK Medical for the benefit of the Count IX Defendants.

1006. The Count IX Defendants participated in the conduct of the RCK Medical enterprise through a pattern of racketeering activities.

1007. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX Defendants' conduct.

1008. The Count IX Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1009. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.

1010. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1011. By virtue of the Count IX Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by the Count IX Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT X**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**RCK MEDICAL SERVICES, P.C. ENTERPRISE**
**(Against Richard Koffler, M.D., Jason Birnhak, D.C., and Johanna Castellano, P.T.)**

1012. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-884 as if set forth fully herein.

1013. Defendants Richard Koffler, M.D., Jason Birnhak, D.C., and Johanna Castellano, P.T. (collectively, "Count X Defendants") willfully conspired with one another to violate 18 U.S.C. § 1962(c) through (or in connection with) the operation of RCK Medical Services, P.C. ("RCK Medical").

1014. The Count X Defendants each agreed to further, facilitate, support, and operate the RCK Medical enterprise.

1015. As such, the Count X Defendants conspired to violate 18 U.S.C. § 1962(c).

1016. The purpose of the conspiracy was to obtain payments, including No-Fault benefit payments, from Allstate for healthcare services provided to patients through RCK Medical even though RCK Medical was not eligible to collect such payments from Allstate because of the unlawful conduct engaged in by the Count X Defendants.

1017. The Count X Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1018. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault benefit payments to (or for the benefit of) RCK Medical as a result of the Count X Defendants' unlawful conduct described herein.

1019. By virtue of the Count X Defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the Defendants identified, three times the damages sustained by

reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XI**
**COMMON LAW FRAUD**
**(Against All Defendants)**

1020. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-884 as if set forth fully herein.

1021. Defendants Jason Birnhak, D.C., Johanna Castellano, P.T., Paul Manadan, M.D., Hye Hyun Chung, L.Ac., Richard Koffler, M.D., Quantum Physical Therapy & Chiropractic Care, PLLC, New Millennium Pain and Spine Medicine, PLLC, Carepoint Acupuncture, P.C., Onepoint Acupuncture, P.C., and RCK Medical Services, P.C. (collectively, "Count XI Defendants") conspired to defraud Allstate through their unlawful management and control of the PC Defendants and by billing for medically unnecessary healthcare services that were purportedly rendered pursuant to predetermined treatment protocols and unlawful referrals.

1022. The Count XI Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that the PC Defendants were entitled to receive No-Fault reimbursement under New York law.

1023. The misrepresentations of fact by the Count XI Defendants included, but were not limited to, the material misrepresentations of fact made in the PC Defendants' NF-3 claim forms, reports, invoices, and other claim-related documentation concerning the legitimacy of the healthcare services purportedly provided to patients of the PC Defendants.

1024. The Count XI Defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

1025. The misrepresentations were intentionally made by the Count XI Defendants in furtherance of their scheme to defraud Allstate by submitting claims from the PC Defendants for payment of No-Fault insurance benefits.

1026. The Count XI Defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

1027. Allstate reasonably relied, to its detriment, upon the Count XI Defendants' material misrepresentations concerning the PC Defendants' eligibility to receive No-Fault reimbursement when making payments for healthcare service purportedly provided to patients through the PC Defendants.

1028. Allstate's damages include, but are not necessarily limited to, all No-Fault benefit payments made by Allstate to the PC Defendants—in excess of $3,778,833.92—for healthcare services purportedly provided to patients through the PC Defendants, even though the PC Defendants were, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**<u>COUNT XII</u>**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

1029. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-884 as if set forth fully herein.

1030. As alleged herein, Defendants Jason Birnhak, D.C., Johanna Castellano, P.T., Paul Manadan, M.D., Hye Hyun Chung, L.Ac., Richard Koffler, M.D., Quantum Physical Therapy & Chiropractic Care, PLLC, New Millennium Pain and Spine Medicine, PLLC, Carepoint Acupuncture, P.C., Onepoint Acupuncture, P.C., and RCK Medical Services, P.C. (collectively,

"Count XII Defendants") conspired to induce Allstate to make numerous substantial payments to the PC Defendants pursuant to New York's No-Fault Laws.

1031. When Allstate made No-Fault payments to the PC Defendants, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XII Defendants, or those persons working under their control, made concerning the PC Defendants' reimbursement eligibility under New York's No-Fault Laws.

1032. Each and every No-Fault benefit payment that Allstate was caused to make to the PC Defendants during the course of this scheme constitutes a benefit that the Count XII Defendants aggressively caused the PC Defendants to seek and voluntarily accept.

1033. Throughout the course of their scheme, the Count XII Defendants caused the PC Defendants to wrongfully obtain from Allstate No-Fault benefit payments totaling over $3,778,833.92 as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

1034. Throughout the duration of this scheme, the Count XII Defendants obtained substantial monetary benefits as a result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault benefit payments that Allstate was wrongfully induced to make to PC Defendants.

1035. Retention of those benefits by the Count XII Defendants would violate fundamental principles of justice, equity, and good conscience.

**COUNT XIII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Quantum Physical Therapy & Chiropractic Care, PLLC, New Millennium Pain and Spine Medicine, PLLC, Carepoint Acupuncture, P.C., Onepoint Acupuncture, P.C., and RCK Medical Services, P.C.)**

1036. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-884 as if set forth fully herein.

1037. To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

1038. In view of the unlawful management and control of Quantum Physical Therapy & Chiropractic Care, PLLC, New Millennium Pain and Spine Medicine, PLLC, Carepoint Acupuncture, P.C., Onepoint Acupuncture, P.C., and RCK Medical Services, P.C. (collectively, the "PC Defendants") and their billing for medically unnecessary and excessive healthcare services, which were rendered pursuant to a predetermined treatment protocol and through unlawful referrals, the PC Defendants have, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus have no standing to seek or collect any No-Fault benefit payments from Allstate including, but not limited to, No-Fault benefits that were assigned to the PC Defendants by their patients.

1039. The PC Defendants continue to challenge Allstate's prior claim denials.

1040. The PC Defendants continue to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

1041. A justifiable controversy exists between Allstate and the PC Defendants because the PC Defendants reject Allstate's ability to deny such claims.

1042. Allstate has no adequate remedy at law.

1043. The PC Defendants will also continue to demand No-Fault benefit payments from Allstate absent a declaration by this Court that their activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by the PC Defendants.

1044. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that (a) the PC Defendants have no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, the PC Defendants.

## XI. DEMAND FOR RELIEF

WHEREFORE, plaintiffs, Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate Indemnity Company (collectively, "Allstate"), respectfully pray that judgment enter in their favor, as follows:

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**QUANTUM PHYSICAL THERAPY & CHIROPRACTIC CARE, PLLC ENTERPRISE**
**(Against Jason Birnhak, D.C. and Johanna Castellano, P.T.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**QUANTUM PHYSICAL THERAPY & CHIROPRACTIC CARE, PLLC ENTERPRISE**
**(Against Jason Birnhak, D.C. and Johanna Castellano, P.T.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT III**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**NEW MILENNIUM PAIN AND SPINE MEDICINE, PLLC ENTERPRISE**
**(Against Paul Manadan, M.D., Jason Birnhak, D.C., and Johanna Castellano, P.T.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT IV**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**NEW MILENNIUM PAIN AND SPINE MEDICINE, PLLC ENTERPRISE**
**(Against Paul Manadan, M.D., Jason Birnhak, D.C., and Johanna Castellano, P.T.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**<u>COUNT V</u>**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**CAREPOINT ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Hye Hyun Chung, L.Ac., Jason Birnhak, D.C., and Johanna Castellano, P.T.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**<u>COUNT VI</u>**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**CAREPOINT ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Hye Hyun Chung, L.Ac., Jason Birnhak, D.C., and Johanna Castellano, P.T.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**<u>COUNT VII</u>**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ONEPOINT ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Hye Hyun Chung, L.Ac., Jason Birnhak, D.C., and Johanna Castellano, P.T.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT VIII**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**ONEPOINT ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Hye Hyun Chung, L.Ac., Jason Birnhak, D.C., and Johanna Castellano, P.T.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT IX**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**RCK MEDICAL SERVICES, P.C. ENTERPRISE**
**(Against Richard Koffler, M.D., Jason Birnhak, D.C., and Johanna Castellano, P.T.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT X**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**RCK MEDICAL SERVICES, P.C. ENTERPRISE**
**(Against Richard Koffler, M.D., Jason Birnhak, D.C., and Johanna Castellano, P.T.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT XI**
**COMMON LAW FRAUD**
**(Against All Defendants)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of Defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by Defendants seeking payment of false and fraudulent invoices; and

(d) GRANT all other relief this Court deems just.

**COUNT XII**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

(a) AWARD Allstate's actual and consequential damages to be established at trial; and

(b) GRANT all other relief this Court deems just.

**COUNT XIII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Quantum Physical Therapy & Chiropractic Care, PLLC, New Millennium Pain and Spine Medicine, PLLC, Carepoint Acupuncture, P.C., Onepoint Acupuncture, P.C., and RCK Medical Services, P.C.)**

(a) DECLARE that Quantum Physical Therapy & Chiropractic Care, PLLC, New Millennium Pain and Spine Medicine, PLLC, Carepoint Acupuncture, P.C., Onepoint Acupuncture, P.C., and RCK Medical Services, P.C., at all relevant times, have been operated in violation of at least one New York state and/or local licensing requirement necessary to provide professional physician services in New York;

(b) DECLARE that Quantum Physical Therapy & Chiropractic Care, PLLC, New Millennium Pain and Spine Medicine, PLLC, Carepoint Acupuncture, P.C., Onepoint Acupuncture, P.C., and RCK Medical Services, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by or on behalf of Quantum Physical Therapy & Chiropractic Care, PLLC, New Millennium Pain and Spine Medicine, PLLC, Carepoint Acupuncture, P.C., Onepoint Acupuncture, P.C., and RCK Medical Services, P.C.; and

(d) GRANT all other relief this Court deems just.

## XII. JURY TRIAL DEMAND

The plaintiffs demand a trial by jury on all claims.

KING, TILDEN, McETTRICK, & BRINK, P.C.

*/s/ Shauna L. Sullivan*
____________________________________

Nathan A. Tilden (NT0571)
ntilden@ktmpc.com
Shauna L. Sullivan (SS5624)
ssullivan@ktmpc.com
Hugh C. M. Brady (HB4724)
hbrady@ktmpc.com
350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214 (office)

Attorneys for the Plaintiffs,
*Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company*

Dated: April 20, 2026